**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Ronald Davidson,

<em>Plaintiff,</em>

v.

The City of New York, Jonathan Darche, Sergeants
Benevolent Association, Vincent Vallelong, Police
Benevolent Association of the City of New York,
and Patrick Hendry,

<em>Defendants.</em>

**1:25-cv-08065 (JAV)(BCM)**


**Oral Argument Requested**


# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF HIS CROSS-MOTION TO AMEND


**COHEN&GREEN P.L.L.C.**
J. Remy Green
Leena Mohmoud Widdi
1639 Centre St., Suite 216
Ridgewood, New York 11385
t: (929) 888-9480

**GIDEON ORION OLIVER**
277 Broadway, Suite 1501
New York, NY 10007
t: 718-783-3682


March 27, 2026

## TABLE OF CONTENTS

TABLE OF CONTENTS ....................................................................................................................ii

TABLE OF AUTHORITIES ...........................................................................................................iv

PRELIMINARY STATEMENT.......................................................................................................1

STATEMENT OF FACTS ...............................................................................................................1

      A.      Plaintiff's background. ...........................................................................................1

      B.      The CCRB hires Plaintiff, knowing his background. ................................................2

      C.      The PBA begins a campaign to get Plaintiff fired, which Darche describes and explains to Plaintiff..............................................................................................2

      D.      Plaintiff records and reports perceived police misconduct. .......................................4

      E.      The PBA and City meet behind the scenes. ...............................................................5

      F.      New York Police unions' long history of engaging in and protecting police misconduct ...........................................................................................................7

STANDARDS OF REVIEW............................................................................................................7

ARGUMENT....................................................................................................................................8

      I.    Defendants Do Not Move to Dismiss Plaintiff's Direct Discrimination and First Amendment Claims. ......................................................................................................8

      II.    Plaintiff's First Amendment Claim Against the City Defendants is Plausible. ..................8

      A.      City Defendants waive any motion to dismiss the well-pled, core First Amendment claim......................................................................................................8

      III.   Plaintiff Plausibly Pleads a Claim for Aiding and Abetting Discrimination against the PBA Defendants........................................................................................................9

      A.      The PBA Defendants shared in the discriminatory intent. .......................................10

      B.      The PBA actually participated in the discrimination.................................................12

      IV.   Plaintiff's Claims Under Sections 1985 and 1986 are Plausible. ....................................12

      A.      Plaintiff has sufficiently pled the relevant class-based animus..................................13

      B.      Plaintiff has sufficiently pled a conspiracy between City and PBA Defendants to violate his rights under the First Amendment.............................................................14

V.   The PBA Defendants' Arguments on Tortious Interference are Misguided. ..................15

   A.   The PBA's confusion about alternative pleading is not a basis to dismiss. ............16

   B.   Plaintiff plausibly pleads but-for cause. .......................................................................16

   C.   Plaintiff plausibly pleads wrongful means or malice. .................................................17

   D.   An Article 78 was unnecessary. .....................................................................................17

VI.   Plaintiff's Right to Record Act Claims Against the City and Defendant Hendry are Plausible. ....................................................................................................................................20

   A.   Defendant Hendry and other members of the NYPD are plausibly officers under the Acts. .........................................................................................................................20

   B.   The Acts prohibit a wide range of interference, including post-recording retaliation. .........................................................................................................................................23

   C.   A CCRB report and the notes allowing someone to file such a report are both "Recordings" under the Acts. ........................................................................................25

   D.   The complaint plausibly alleges Defendants retaliated against Plaintiff for the contemporaneous recording itself. ................................................................................25

VII.   The First Amendment Does Not Insulate the PBA Defendants' Relevant Conduct Here. 26

VIII. The Court Should Grant Plaintiff's Cross-Motion to Amend ...........................................28

CONCLUSION .......................................................................................................................................30

WORD COUNT CERTIFICATION ..................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ashcroft v. Iqbal,*
  556 US 662 (2008)..........................................................................................................8

*Awad v. City of New York,*
  2014 U.S. Dist. LEXIS 63234 (E.D.N.Y. May 7, 2014)....................................................10

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007)..................................................................................................7, 14

*Case, et al. v. City of N.Y., et al.,*
  233 F.Supp.3d 372 (SDNY 2017).....................................................................................7

*Clinton v Brown & Williamson Holdings, Inc.,*
  2013 US Dist LEXIS 87204 (SDNY June 20, 2013)........................................................27

*Cohen v Am. Airlines, Inc.,*
  13 F.4th 240 (2d Cir 2021)............................................................................................29

*Conklin v. Lovely,*
  834 F.2d 543 (6th Cir. 1987)..........................................................................................14

*Demaria v NY State Unified Ct. Sys.,*
  2024 US Dist LEXIS 43257 (SDNY 2024)......................................................................18

*DeWitt v. Lieberman,*
  48 F. Supp. 2d 280 (S.D.N.Y.1999).................................................................................10

*Espinal v Goord,*
  558 F3d 119 (2d Cir 2009)...............................................................................................9

*Finley v Giacobbe,*
  79 F3d 1285 (2d Cir. 1996)...............................................................................15, 19, 20

*Fleurentin v NY City Health & Hosps. Corp.,*
  2020 US Dist LEXIS 908 (EDNY 2020)..........................................................................10

*Fox News Network v Time Warner,*
  962 F Supp 339 (EDNY 1997).......................................................................................28

*Fried v. LVI Servs.,*
  2011 U.S. Dist. LEXIS 57639 (SDNY 2011)............................................................. 10, 12

*Gartenberg v Cooper Union for the Advancement of Science & Art,*
  765 F Supp 3d 245 (SDNY 2025) .................................................................................26

*Gaugaix v. Laboratoires Esthederm USA, Inc.,*
  2000 U.S. Dist. LEXIS 15075 (SDNY 2000).................................................................10

*Gilliam v Greenberg Traurig LLP,*
  2024 US Dist LEXIS 159129 (SDNY Sep. 4, 2024)......................................................14

*Hall v Warren,*
  2022 US Dist LEXIS 116358 (WDNY June 30, 2022) ..................................................14

*Henry v Daytop Vil.,*
  42 F3d 89 (2d Cir 1994) ................................................................................................16

*Keating v. Carey,*
  706 F.2d 377 (2d Cir. 1983)...........................................................................................14

*Kouvchinov v Parametric Tech. Corp.,*
  537 F3d 62 (1st Cir 2008) .............................................................................................17

*Leblanc-Sternberg v. Fletcher,*
  781 F Supp 261 (SDNY 1991)........................................................................................28

*Life Ins. Co. of North America v. Reichardt,*
  591 F.2d 499 (9th Cir. 1979)..........................................................................................14

*Lubonty v U.S. Bank N.A.,*
  34 NY3d 250 (NY 2019)................................................................................................20

*McAuliffe v Pomposello,*
  2011 US Dist LEXIS 115837 (SDNY Oct. 3, 2011) .....................................................22

*McLean v. International Harvester Co.,*
  817 F.2d 1214 (5th Cir. 1987) .......................................................................................14

*Mosdos Chofetz Chaim, Inc. v Vil. of Wesley Hills,*
  701 F Supp 2d 568 (SDNY 2010) ..................................................................................28

*Newton v LVMH Moet Hennessy Louis Vuitton Inc.,*
  2025 US Dist LEXIS 126427 (SDNY July 2, 2025) ......................................................29

*NY State NOW v Terry,*
  886 F2d 1339 (2d Cir 1989)...........................................................................................13

*Potenza v City of NY,*
  365 F3d 165 (2d Cir 2004).......................................................................................24, 25

*Purcell v. N.Y. Inst. of Tech.-Coll. of Osteopathic Med.*,
    931 F.3d 59 (2d Cir. 2019) ...........................................................................................................18

*Razzano v. Remsenburg-Speonk Union Free Sch. Dist.*,
    No. 11 Civ. 2920 (KAM), 2020 U.S. Dist. LEXIS 181065, 2020 WL 5820327 (EDNY 2020),
    *aff'd*, 2022 U.S. App. LEXIS 14644, 2022 WL 1715977 (2d Cir. 2022) ............................................19

*Risley v Rubin*,
    272 AD2d 198 (1st Dept 2000).....................................................................................................18

*Shamir v. City of N.Y.*,
    804 F.3d 533 (2d Cir. 2015) .........................................................................................................7

*Shultz v. Congregation Shearith Israel*,
    867 F.3d 298 (2d Cir. 2017) ........................................................................................................12

*Simmtech Co. v Barclays Bank PLC (In re Foreign Exch. Benchmark Rates Antitrust Litig.)*,
    74 F Supp 3d 581 (SDNY 2015)...................................................................................................15

*Starr v Sony BMG Music Entertainment*,
    592 F3d 314 (2d Cir 2010) ..........................................................................................................14

*Tardif v. City of New York*,
    991 F. 3d 394 (2d Cir. 2021) ............................................................................................ 8, 9, 14

*Terry v. Ashcroft*,
    336 F.3d 128 (2d Cir. 2003) ........................................................................................................12

*United States v Caronia*,
    703 F3d 149 (2d Cir 2012) ..........................................................................................................27

*United States v. Freeman*,
    761 F.2d 549 (9th Cir. 1985).........................................................................................................27

*United States v. Rowlee*,
    899 F.2d 1275 (2d Cir. 1990) .......................................................................................................27

*United States v. Rowlee*,
    899 F2d 1275 (2d Cir 1990) .........................................................................................................28

*United States v. Stromberg*,
    22 F.R.D. 513 (SDNY 1957).........................................................................................................27

*United States v Van Hise*,
    2013 US Dist LEXIS 181894 (SDNY 2013) .................................................................................27

*Volk v. Coler*,
    845 F.2d 1422 (7th Cir. 1988) ......................................................................................................14

*Weber v FujiFilm Med. Sys. U.S.A.*,
  854 F Supp 2d 219 (D Conn 2012) ........................................................................17

*Whitfield v City of NY*,
  96 F.4th 504 (2d Cir. 2024) .................................................................................19

*Williams v Police Dept. of City of NY Sch. Safety Div.*,
  2012 NY Slip Op 33638[U] (Sup Ct, NY County 2012) .........................................18

*Williams v Police Dept. of City of NY Sch. Safety Div.*,
  2012 NY Slip Op 33638[U] (Sup Ct, NY County 2012) .........................................18

*Matter of Wyandanch Union Free Sch. Dist. v Town of Babylon Indus. Dev. Agency*,
  ___AD3d___, 2026 NY Slip Op 00252 (2d Dept, 2026) ......................................24

*Zellner v. Summerlin*,
  494 F.3d 344 (2d Cir. 2007) ..................................................................................8

**STATUTES**

42 U.S.C § 1983 ............................................................................................................8

29 USCS § 2615(a)(1) ..................................................................................................24

29 USCS § 2615(b) .......................................................................................................24

N.Y. Admin. C. § 14-189 (a) ..........................................................................21, 22, 23

N.Y. Correction Law § 752 ..........................................................................................3

N.Y. Exec. Law § 296(15) ...........................................................................................10

29 U.S.C. § 2601, *et seq.* .......................................................................................24, 25

**OTHER AUTHORITIES**

U.S. Const., amend. I ...........................................................................................*passim*

CPLR 7803 ..................................................................................................................19

CPLR 7806 ..................................................................................................................19

Fed. R. Civ. P. 8(a)(2) ..................................................................................................7

Fed. R. Civ. P. 8(d)(3) .................................................................................................16

Fed. R. Civ. P. 15(a)(2) ...............................................................................................29

J. Remy Green, *Digitizing Brandenburg: Common Law Drift Toward a Causal Theory of Imminence*, 69
  Syracuse L. Rev. 351 (2019) ..................................................................................27

**PRELIMINARY STATEMENT**

Plaintiff Ronald Davidson was incarcerated for 43 years for a crime he committed at age 17. During and after his incarceration, Plaintiff pursued his education and a life of public service, and in 2024, he was offered a position with the CCRB.

Soon after Plaintiff started at the CCRB, however, PBA Defendants expressed outrage that someone with a conviction could ever participate in police accountability — and began a behind-the-scenes campaign to force the City to terminate Plaintiff. City Defendants joined that project, violating the law — and indeed, City Defendants do not challenge Plaintiff's conviction-discrimination claim. Because of the PBA, Defendant Darche warned Plaintiff to "lay low" and to "not rock the boat," expressing that would let both Plaintiff and Darche keep their jobs against PBA attacks. Shortly thereafter, however, Plaintiff observed and documented police misconduct (as any citizen is entitled to do). And he used that documentation to submit a CCRB Report. The next day, Plaintiff was terminated. And the CCRB report was closed soon after, in a manner completely different from any ordinary CCRB case.

While there are many moving parts, the crux of this motion is simple: Defendants have admitted the City and the PBA had *at least four* high-level phone calls about Plaintiff. Green Ex. 1 at 3. The City specifically called the PBA to make sure they knew "Plaintiff was no longer employed by the CCRB." *Id.* And the City Defendants do not even try to explain why the First Amendment retaliation alternative claim (based on the CCRB report) should be dismissed.

At the pleading stage that is more than enough — given the timing, motivation is assumed even at summary judgment. Accordingly, this case should proceed in full to discovery — not just the discrimination claim.

**STATEMENT OF FACTS**

**A. Plaintiff's background.**

1

Over 5 decades ago, at age 17, Plaintiff Ronald Davidson was convicted of a triple homicide. First Amended Complaint, ECF No. 32 ("FAC") ¶ 23. Plaintiff served 43 years in prison, during which he earned his bachelor's degree in Community and Human Services. *Id.* ¶ ¶ 24-25. Upon his release in 2016, Plaintiff took a variety of courses aimed at re-entry and public service. *Id.* ¶ 26.

### B.  The CCRB hires Plaintiff, knowing his background.

On October 21, 2024, Plaintiff began working for the CCRB as an "Investigator – Level 1."  FAC ¶¶ 27-29. Plaintiff disclosed and discussed his conviction at length throughout the hiring process and passed a Department of Investigation Background Investigation. *Id.* ¶¶ 30-34. Plaintiff began the customary nine-week probationary and training period, after which he was to take an exam, and be assigned a caseload.  *Id.* ¶ 63. Plaintiff fully complied with every term and condition of his employment, and he excelled at every aspect of training. *Id.* ¶ 35; 61-62.

### C.  The PBA begins a campaign to get Plaintiff fired, which Darche describes and explains to Plaintiff.

Unfortunately, however, as soon as PBA Defendants learned of Plaintiff's employment, they began to engage in both a private and public pressure campaign to demand that Plaintiff be terminated FAC ¶¶ 41; 109; 111. Through their public statements — though Plaintiff does not sue over those statements directly — PBA Defendants made their discriminatory intentions clear: they were advocating for Plaintiff's termination *because of* his criminal conviction. *Id.* ¶ 58.

Defendant Hendry, a member of the NYPD and president of the union representing NYPD members stated that "Police officers should not be subjected to the judgment of someone who was convicted of three murder[s.] Moreover, the NYPD should not be turning over mass amounts of sensitive law enforcement information to someone with this kind of criminal record." *Id.* ¶ 51. He

2

further declared that if Plaintiff had "*any role*" in the CCRB, it was "up to the [PBA[1]] to ensure that doesn't happen." *Id.* ¶ 52; 54; 112.[2]

Days after Plaintiff began his job, on December 3, 2025, Defendant Darche called him in for a meeting to discuss the pressure Darche was receiving. Darche stated to Plaintiff that his goal was to "figure out a way to get through [the situation] that keeps both of us employed." FAC ¶ 67 He told Plaintiff that he was "probably collateral damage in someone taking a shot at me [e.g., Darche]." *Id.* ¶ 68. Darche said, regarding Plaintiff's conviction, "In the end, you didn't do anything wrong recently" and "society said you're going to pay this debt, and you paid it." *Id.* ¶¶ 69-70. Darche told Plaintiff that he thought it would be "enough that …[Plaintiff was] not interviewing cops" and "not writing closing reports," and asked that Plaintiff agree to work primarily as a "field" investigator, rather than in a role where he would directly interact with police-facing CCRB complaints. *Id.* ¶¶ 72-73. Plaintiff obliged.

Darche further told Plaintiff that "there's going to be a lot of pressure on me to fire you" even if Plaintiff did pass the test at the conclusion of his probationary period. *Id.* ¶ 71. He assured Plaintiff, however, that even if he did not pass the test, he would be placed "somewhere in outreach," with "100%" the same pay. *Id.* ¶ 74. Darche then said, "I plan [to] tell them" — defining "them" as "everyone" including the PBA and Mayor's office — "as little as possible to get them off my back."

---

[1] Read in the light most favorable to Plaintiff, Hendry's use of "NYPD" *meant* "the PBA." The statement does not make sense if it was advocating that the NYPD take action separate from the PBA, because the NYPD has no role in CCRB hiring and firing. Rather, the best reading of the statement is that Hendry meant "NYPD" to be an "us" inclusive of the PBA, in contrast to the CCRB's "them" — that is, the statement was saying, "if the CCRB *won't* make sure Davidson is fired, we, the NYPD *will.*"

[2] To adopt the PBA's more modest reading of this statement of intent (PBA MOL at 13), the Court would need to read the statement in the light most favorable to the PBA Defendants, not to Plaintiff. For example, the CCRB's *entire work* is investigations, so to say "Plaintiff should not have a role in '*investigations*'" (*id.* (emphasis added by PBA)) is — at least reading the statement in the light most favorable to Plaintiff — a statement Plaintiff can have no role at the CCRB at all. And whether the PBA can prove an affirmative defense based on Correction Law § 752 is a question to be resolved based on facts outside the complaint — presumably the facts that the PBA will allege in its affirmative defenses, which Plaintiff could then test at the relevant pleading stage — not a defect on the face of the complaint.

*Id.* ¶ 76. Darche conveyed to Plaintiff that although he was under a lot of pressure to illegally fire Plaintiff because of Plaintiff's conviction, he would not be fired. *Id.* ¶ 78. Darche asked for cooperation in keeping his profile low, so that the PBA could not take "shots" at Darche through Plaintiff. Id. ¶ 79.

Three days later, on December 6, 2025, Plaintiff and Darche had another conversation about PBA Defendants' efforts to force the City to fire Plaintiff. *Id.* ¶ 80. By that point, Plaintiff had attended two public CCRB meetings, along with other members of his cohort. *Id.* ¶ 84. During their conversation, Defendant Darche told Plaintiff that he needed to "not rock the boat," to avoid the unions' ire and to "land[] this plane" — i.e., to get through his probationary period and let the controversy die down. *Id.* ¶¶ 81-82. He told Plaintiff that he believed he had another "solution" to the unions' attacks, which was for Plaintiff not to attend public CCRB meetings. *Id.* ¶ 90. Darche's message to Plaintiff was essentially that he needed to lie low, but that he was not going to be fired. *Id.* ¶ 88.

### D. Plaintiff records and reports perceived police misconduct.

On December 9, 2025, Plaintiff was on his way to work when he saw NYPD members engaging in what he perceived as misconduct. FAC ¶¶ 91-92. Plaintiff politely asked the NYPD members for their business cards and identification. *Id.* ¶ 93. The officers ignored Plaintiff's requests and declined to even write down their information, as the Right to Know Act requires of them. *Id.* ¶¶ 95-104. Plaintiff resorted to recording the information by writing down descriptions of the officers and filed a CCRB complaint that same day. He did so as a citizen of New York City and a member of the public. *Id.* ¶ 108.

The very next day, on December 10, 2025, CCRB Jennel Brooks called Plaintiff into her office and terminated him based on a purported "failure to pass probation." *Id.* ¶¶ 119-120. Ms. Brooks explained to Plaintiff that he was "putting too much heat on the agency." *Id.* ¶ 123. That "heat"

4

reference was referring to specific communications from the unions, threatening things such as strikes or other action, if the City did not fire Plaintiff. *Id.* ¶ 125. The claim that Plaintiff failed to pass probation was pure pretext, as Plaintiff passed every other part of probation, and the City fired Plaintiff *before the test that would be a mechanism for failing probation* would have been administered. *Id.* ¶¶ 125-128. Instead, Plaintiff was — as pled in the alternative — either fired because of his recording of police misconduct and subsequent reporting of that recording or because of his past convictions. *Id.* ¶ 117. Defendant City chose to fire Plaintiff after demands and discussions with the PBA, discussed in more detail below. *Id.* ¶ 118.

Just over a month later, on January 14, 2025, the case resulting from Plaintiff's CCRB complaint was closed. *Id.* ¶ 143. The CCRB could not have conducted a reasonable investigation in accordance with their policies within those short weeks, which even included winter holidays. *Id.* ¶ 145. CCRB training requires an investigator to contact the complaining victim within 72 hours of a complaint and schedule a full interview. *Id.* ¶ 148. Plaintiff, the complaining victim in this case, was never contacted by the CCRB or interviewed, even after Plaintiff affirmatively contacted the assigned investigator and left him a voicemail. *Id.* ¶ 150. CCRB training also requires investigators to request body worn camera footage and Transit Authority video when relevant. *Id.* ¶¶ 154-154. At that time (and often now), production of body worn camera footage to the CCRB took at least several months. *Id.* ¶ 157. Given that, it is implausible that body worn camera was received before the case was closed, which would have violated CCRB policy. *Id.* ¶ 158.

Then, even after the case was closed, the assigned investigator did not contact Plaintiff to notify him of the disposition and review process—another violation of CCRB policy. And when the complaint was closed, the public closing notice contained no explanation, which is also CCRB policy. *Id.* ¶ 166.

**E.  The PBA and City meet behind the scenes.**

Throughout this period, as revealed in the limited discovery that the parties agreed would be "informative regarding issues in the union motions to dismiss" (ECF No. 31 at 3), the PBA and City were in meaningful, behind the scenes conversation.

Plaintiff began his employment in late October 2024. Right away, on November 1, "Fred Vasselman, counsel for the PBA, on a phone call, asked Jonathan Darche if he knew that the CCRB had hired someone who had been convicted of murder, in reference to Plaintiff." Green Ex. 1 at 3.[3] And "in October or November 2024, Fred Vasselman or Stuart London, counsel for the PBA, called Jonathan Darche after Plaintiff sat in an officer interview." *Id.*

Though Defendants have not revealed the duration or precise contents of these conversations, apparently the City and Darche believed there was a need to provide updates to the PBA in response. "During November or December 2024, Jonathan Darche spoke to either Fred Vasselman or Stuart London, counsel for PBA, and informed that individual that Plaintiff had been transferred to the role of field investigator." *Id.* Again, at that exact same time, Darche was explaining that these changes were meant to pacify the PBA. On December 3, Darche was telling Plaintiff he was going to "figure out a way to get through [the situation] that keeps both of us employed." FAC ¶ 67. And on December 6, he told Plaintiff that he believed he had another "solution" to the unions' attacks, which was for Plaintiff not to attend public CCRB meetings. *Id.* ¶ 90. In other words, the updates Darche was providing were trying to mollify the PBA in reference to demands apparently made in the first calls.

Then, on "December 10 and 12, 2024, Jonathan Darche called Fred Vasselman and Vincent Vallelong, respectively, and informed Vasselman and Vallelong that Plaintiff was no longer employed by the CCRB." Green Ex. 3 at 3. That is, it appears he called to tell them their demands to fire Plaintiff

---

[3] These facts are also covered by the propose Second Amended Complaint.

6

had been met, since nothing else would "get them off my back." FAC ¶ 76. And if their demand was *not* to fire Plaintiff, why did Darche feel the need to call them *after* the call where he already told them Plaintiff "had been transferred to the role of field investigator"? Green Ex. 3 at 3. The reading most favorable to Plaintiff is that the PBA had demanded exactly that.

### F. New York Police unions' long history of engaging in and protecting police misconduct

New York City's Police Unions, including PBA Defendants, have a long history of protecting police misconduct—no matter how egregious the conduct—and of going to all lengths to prevent police accountability. *See* FAC ¶181. One of the primary targets of the police unions has been the CCRB. At every stage of the Board's expansion since its creation in 1953, the PBA has staged an obstacle and has been successful at exerting pressure upon the City and extracting specific results— often through blatantly illegal or discriminatory means. *Id.* ¶¶182-188. They used some of those tactics here to secure Plaintiff's termination by the City.

### STANDARDS OF REVIEW

The applicable federal rules require only that a plaintiff plead "a short and plain statement of the claim" to entitle them to discovery. *See* Fed. R. Civ. P. 8(a)(2); *see also, e.g., Shamir v. City of N.Y.*, 804 F.3d 533, 556 (2d Cir. 2015). Under the familiar standard of review that applies to a motion to dismiss, the Court must accept as true all plausibly pleaded allegations in the FAC and draw all reasonable inferences therefrom in Plaintiff's favor. *See, e.g., Case, et al. v. City of N.Y., et al.*, 233 F.Supp.3d 372, 382 (SDNY 2017) (citing cases). If the allegations in the pleadings sufficiently "raise the right to relief above the speculative level," dismissal is inappropriate. *Bell Atl. Corp. v. Twombly*, 550 US 544, 570 (2007).

A claim is facially plausible when a plaintiff pleads facts that are "suggestive enough to render" the defendants liable. *Id.* at 556. This standard is not a probability requirement. *Id.* Rather, it asks for more than a "sheer possibility" that a defendant acted unlawfully. *Id.* As the Second Circuit has

7

recognized, to the extent there are any disputed facts, they are for a jury to decide. *See*, *e.g., Zellner v. Summerlin*, 494 F.3d 344, 368, 371 (2d Cir. 2007) (citing cases). As long as there is enough factual matter to 'nudge [ plaintiffs'] claims…'across the line from conceivable to plausible,'" the case should proceed to discovery. *Ashcroft v. Iqbal*, 556 US 662, 680 (2008), quoting *Twombly*, 550 U.S. at 570.

## ARGUMENT

### I.   Defendants Do Not Move to Dismiss Plaintiff's Direct Discrimination and First Amendment Claims.

To be clear, no Defendant moves to dismiss Plaintiff's core, alternative discrimination/First Amendment claim. The complaint pleads, in the alternative that "[e]ither: (1) the City fired Plaintiff for his background alone; or (2) it fired him because of the CCRB report." FAC ¶ 137.

The City's motion is explicitly partial and does not challenge that Count II (e.g., that the City fired Plaintiff for his conviction) is well-pled; and (as shown further below) it does not challenge Plaintiff's First Amendment retaliation claim as a theory of why he was fired.

Accordingly, regardless of the result on this motion, those claims will proceed. No party may argue for dismissal of those claims for the first time on reply. *Tardif v. City of New York*, 991 F. 3d 394, 404 n.7 (2d Cir. 2021).

### II.   Plaintiff's First Amendment Claim Against the City Defendants is Plausible.

Plaintiff alleges two distinct bases for his First Amendment claims under 42 U.S.C § 1983: pure retaliation for his protected speech, and prior restraint on future speech. *See* FAC ¶ 209-210.

The City Defendants' memorandum addresses Plaintiff future-facing, prior restraint argument (*see, e.g.,* ECF No. 44 ("City MOL") at 12-13) but fail to address the bulk of Plaintiff's First Amended claim. And the parties have since resolved the future-facing claims, so the only live portion of Defendants' motion that addresses the First Amendment is moot.

####    A.   City Defendants waive any motion to dismiss the well-pled, core First Amendment claim.

As explained explicitly in the FAC, Plaintiff's First Amendment theory is not *just* that a "bar on entering the CCRB" would "constitute a prior restraint under First Amendment law" (City MOL at 13), but *also* that "Defendants retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment" including by making a "choice to fire Plaintiff." FAC ¶¶ 205-209. That is, he alleged a "First Amendment … claim" sounding in retaliation "to the extent that his CCRB report moved the needle" in his firing. FAC ¶ 139. As the FAC explains:

> "137. Either: (1) the City fired Plaintiff for his background alone; or (2) it fired him because of the CCRB report.
>
> 138. In the event of (1), that is pure discrimination — but Plaintiff would not have an additional First Amendment/Right to Record/etc. claim.
>
> 139. In the event of (2), Plaintiff has shown an entitlement to discovery about what motivation was the driving factor, but he also has — to the extent that his CCRB report moved the needle — a First Amendment/Right to Record/etc. claim sounding in retaliation."

*Id.* ¶¶ 137-138.[4]

By failing to even address the First Amendment retaliation claim connected to the CCRB report, the City Defendants waive any right to move to dismiss it. *Tardif*, 991 F. 3d at 404 n.7. But given the proximity in time, and Defendant Darche's explicit statements about "rocking the boat" and the like, the claim is well-pled anyway. *Espinal v Goord*, 558 F.3d 119, 129 (2d Cir. 2009).

## III. **Plaintiff Plausibly Pleads a Claim for Aiding and Abetting Discrimination against the PBA Defendants.**

As noted above, the City Defendants do not move to dismiss Plaintiff's discrimination claims. Accordingly, the question on this motion is whether Plaintiff has plausibly pled that the PBA Defendants aided and abetted the conduct at issue in the unchallenged discrimination claim.

---

[4] To be clear, if the City Defendants *conceded for the litigation* that Plaintiff's conviction was the sole basis for his firing, Plaintiff would stipulate to that fact, and that agreement would require dismissal of the First Amendment claim. But without such an agreement, Plaintiff is entitled to pursue alternative theories of motivation at this stage, and has plausibly pled that *either* his conviction *or* his CCRB report were the motivating factor in his firing.

Section 296(15) of the Executive Law makes it unlawful for an employer to deny any person employment based on their "having been convicted of one or more criminal offenses." N.Y. Exec. L. § 296(15). And the same law extends liability beyond an employer to anyone who "aid[s], abet[s], incite[s], compel[s], or coerces such a violation."[5] N.Y. Exec. L. § 296(15). For convenience, while the law includes five types of conduct, Plaintiff refers to this sort of claim as an "aiding claim" below. Here, the complaint as against the PBA Defendants presents only an aiding claim.

Courts typically apply "the same framework and pleading standard as Title VII claims." *Awad v. City of New York*, 2014 U.S. Dist. LEXIS 63234, at *5 (E.D.N.Y. May 7, 2014); *See also Gaugaix v. Laboratoires Esthederm USA, Inc.*, 2000 U.S. Dist. LEXIS 15075, at 6 (SDNY 2000). With regard to either a Title VII claim or a claim under NYSHRL, "at the pleading stage, the plaintiff has a 'minimal' initial burden; he need not prove every element of a prima facie case of discrimination, but he must allege facts that plausibly suggest that his employer took an adverse action" because of his membership in a protected class. *Fleurentin v NY City Health & Hosps. Corp.*, 2020 U.S. Dist. LEXIS 908, at *11 (EDNY 2020), *citing Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85-86 (2d Cir. 2015). And as to a third party, he must plausibly allege that such person "share[d] the intent or purpose of the principal actor," and "actually participated" in the conduct. *Fried v. LVI Servs.*, 2011 U.S. Dist. LEXIS 57639, at 22 (SDNY 2011).

### A. The PBA Defendants shared in the discriminatory intent.

The statements of PBA Defendants' about Plaintiff's employment to the press, while not a basis for a cause of action alone, make their shared intentions to discriminate against Plaintiff clear. Such

---

[5] To establish a claim for accessorial liability under New York State Human Rights Law § 296(6), liability must first be established against the plaintiff's employer. *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y.1999) ("There is . . . a requirement that liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor.").

10

statements, when coupled with the additional context described above, are suggestive enough to make

a coercion/abetting/etc. theory plausible. That additional context includes at least the following:

1. The PBA had at least four high-level conversations, that began *because* it learned "CCRB had hired someone who had been convicted of murder" and ended, to the PBA's apparent satisfaction, with the disclosure that the City fired Plaintiff (Green Ex. 3 at 3);

2. The PBA's official public position was that if Plaintiff was given "*any role*" in the CCRB, it was "up to the [PBA] *to ensure that doesn't happen*" (*Id.* ¶ 52; 54; 112 (emphasis added));

3. Darche and other City employees made repeated reference to "heat," "pressure," and the like from the PBA, in the context of discussing whether Plaintiff would still have a job (*see, e.g.,* FAC ¶¶ 62, 71, 76-77, 80-82, 123-125);

4. When Darche effectively changed the nature of Plaintiff's role as investigator, he told Plaintiff that he planned to "tell" PBA Defendants, among others, "as little as possible to get them off [his] back" (FAC ¶¶ 73-76);

5. Darche told Plaintiff that PBA Defendants, among others, took issue with the fact that Plaintiff attended public CCRB meetings, and suggested that Plaintiff no longer attend those meetings as a "solution" to PBA Defendants' complaints (FAC ¶ 90);

6. The PBA Defendants' efforts, like coordinated union efforts in the past (*see, e.g., FAC* ¶¶ 181-203), were not limited to public comments, but involved significant behind-the-scenes direct advocacy; and

7. PBA Defendants explicitly stated the basis of their objection to Plaintiff's employment when Defendant Hendry declared that "[p]olice officers should not be subjected to the judgment of someone who was convicted of three murder[s.] Moreover, the NYPD should not be turning over mass amounts of sensitive law enforcement information to someone with this kind of criminal record" (FAC ¶ 51).

Taken together, viewing the above as true and in the light most favorable to Plaintiff, this Court can

reasonably infer that PBA Defendants targeted Plaintiff because of his criminal conviction. The PBA

was clear it was "up to" it to "ensure" Plaintiff did not have "any role" at the CCRB *because of his*

*conviction*, and achieved that aim successfully.[6]

---

[6] PBA Defendants contend that any pressure they exerted upon the CCRB was to ensure that Plaintiff not have a role in investigations—i.e., that he be removed from the role he was hired for—but *not necessarily* that he be terminated. *See* PBA MOL at 13. This theory requires ignoring other well-pled facts and affording the PBA the *most* favorable construction of the facts. That is, as pled in the complaint, PBA Defendants were advocating for — and attempting to coerce — Plaintiff's termination. That conclusion is supported sufficiently at this stage by the simple fact that the PBA Defendants' advocacy continued even after Plaintiff was moved to a different role at their demand. But even advocating for Plaintiff to have "significantly diminished material responsibilities" because of his criminal conviction was an attempt to coerce an adverse

### B.  The PBA actually participated in the discrimination.

The cases interpreting section 296 require a plaintiff to plead "direct, purposeful participation" in making out an aiding claim. *Fried*, 2011 U.S. Dist. LEXIS 57639, at \*22. The PBA Defendants' arguments on this front proceed by claiming "no facts are alleged to show any communication by the PBA Defendants with City regarding this matter."  PBA MOL at 12.

While Plaintiff disagrees,[7] it is a moot point at this stage:  Discovery has revealed the PBA had extensive back-channel conversations with the City, aimed at coercing Plaintiff's firing.  *See generally Green* Ex. 3.  If Plaintiff's inferences were not plausible before, they certainly are now.[8]

In short, the statute includes actions that "compel" or "coerce" discrimination. And Darche's and Brooks's descriptions of the phone calls the City has now given the date, time, and participants in was clear: "There's still going to be a lot of pressure on me to fire you"; Plaintiff was "putting too much heat on the agency"; Plaintiff was "rock[ing] the boat" and so on.  FAC ¶¶ 62, 71, 76-77, 80-82, 121-125. That is, the PBA was coercing and compelling the City to discriminate because "the CCRB had hired someone who had been convicted of murder."  Green Ex. 3 at 3.

## IV.  Plaintiff's Claims Under Sections 1985 and 1986 are Plausible.

Defendants seek to dismiss Plaintiff's Section 1985 and 1986 arguments, essentially, because "Criminal history is not a federally protected class." PBA MOL at 3; *accord* City MOL at 11. That misunderstands the claim. As explained in the FAC, the crux of these claims is *not* that Plaintiff was

---

employment action and therefore a violation of the NYSHRL. *Shultz v. Congregation Shearith Israel*, 867 F.3d 298, 304 (2d Cir. 2017) (citation omitted); FAC ¶¶ 47; 65-67; 73-75; *See also Terry v. Ashcroft*, 336 F.3d 128, 144 (2d Cir. 2003).

[7] That is, even without the specifics Defendants have now testified to, it was plausible Darche was not lying in his extensive descriptions of the "heat" and "pressure" the PBA was putting on him to fire Plaintiff.  And now, the City's disclosures seem to **confirm** he was not lying about that pressure.

[8] Some of the PBA Defendants' arguments are that Plaintiff essentially seeks to extend "liability to media organizations, observers, and advocates who publicly comment or express viewpoints on a matter of public concern."  PBA MOL at 13. But that ignores that the FAC is abundantly clear "it is not the comments to the Post that Plaintiff is suing over. Rather, these comments are context that reveals the intention driving nonpublic advocacy the union Defendants engaged in." FAC ¶ 56.

discriminated against for his criminal conviction, but explicitly as "an alternative theory," Plaintiff is alleging that "Defendants collaborated to retaliate against Plaintiff *for filing the CCRB report*." FAC ¶ 227 (emphasis added). Both motions fail to even acknowledge, let alone address this theory, and accordingly fail to address the line of cases discussing that the targeting of First Amendment perspectives — even as it would not trigger suspect class analysis under the Equal Protection clause — can suffice under Sections 1985 and 1986.

If Defendants collectively were to concede they targeted Plaintiff because of his criminal history, Plaintiff agrees that fact would require dismissal of his 1985 and 1986 claims. But otherwise, that fact remains to be resolved in discovery, and the Complaint pleads in the alternative that PBA Defendants meant to target him because he reported police misconduct. Or more precisely, because of his political associations and his demonstrated commitment to opposing police misconduct. And that fits neatly within the sorts of classes based on political associations that the Second Circuit has been clear can suffice for 1985 claims, even as they would not qualify for direct suspect class status. *See, e.g., NY State NOW v Terry*, 886 F.2d 1339, 1359 (2d Cir. 1989). As the Second Circuit has explained:

> "By its very language § 1985(3) is necessarily tied to evolving notions of equality and citizenship. As conspiracies directed against women are inherently invidious, and repugnant to the notion of equality of rights for all citizens, they are therefore encompassed under the Act.
>
> Moreover, this Circuit as well as other Circuits have held that § 1985(3) encompasses women as a class, or classes based on political associations, or those based on ethnicity, none of which groups were specifically contemplated by the 42nd Congress."

*Id.* (collecting cases).

### A. Plaintiff has sufficiently pled the relevant class-based animus.

PBA and City Defendants insist that Plaintiff's 1985 and 1986 claims must be dismissed because he did not plausibly plead that Defendants had the relevant animus. Courts have recognized any number of similar or analogous sorts of animus — including claims where plaintiffs allege they were

"treated differently because of the First Amendment-protected viewpoint they were espousing." *Hall v Warren*, 2022 U.S. Dist. LEXIS 116358, at *28 (WDNY June 30, 2022) (denying motion where, as here, the argument only addressed class-based animus in racial terms). *Accord*, *e.g.*, *Keating v. Carey*, 706 F.2d 377, 386-88 (2d Cir. 1983) (political affiliation); *Volk v. Coler*, 845 F.2d 1422, 1434 (7th Cir. 1988) ("§ 1985(3) extends . . . to conspiracies to discriminate against persons based on sex, religion, ethnicity or political loyalty."); *Conklin v. Lovely*, 834 F.2d 543, 549 (6th Cir. 1987) (political views); *McLean v. International Harvester Co.*, 817 F.2d 1214, 1218-19 (5th Cir. 1987) ("political beliefs or associations"); *Life Ins. Co. of North America v. Reichardt*, 591 F.2d 499, 505 (9th Cir. 1979) (women purchasers of disability insurance).

Without any argument on these sorts of conspiracies, Defendants cannot make one for the first time in reply. *Tardif*, 991 F. 3d at 404 n.7.

**B. Plaintiff has sufficiently pled a conspiracy between City and PBA Defendants to violate his rights under the First Amendment**

As discussed above, particularly with the concessions the City offered as to time, date, and participation in conversations — all that is necessary even under the broadest reading of *Twombly*. 550 US at 565, n. 10 (complaint was implausible in part because it "mentioned no specific time, place, or person involved in the alleged conspiracies").[9]

So while the Second Circuit has held "a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end," *Gilliam v Greenberg Traurig LLP*, 2024 U.S. Dist. LEXIS 159129, at 9-10 (SDNY Sep. 4, 2024), the FAC more than puts "Defendants on notice of the nature of the agreements at issue, as

---

[9] The Second Circuit has described this piece of *Twombly* as "dicta," noting a plaintiff is "not required to mention a specific time, place or person involved in each conspiracy allegation." *Starr v Sony BMG Music Entertainment*, 592 F.3d 314, 325 (2d Cir. 2010).

well as how those agreements came into being." *Simmtech Co. v Barclays Bank PLC (In re Foreign Exch. Benchmark Rates Antitrust Litig.)*, 74 F Supp 3d 581, 593-594 (SDNY 2015).

Meanwhile, PBA Defendants' argument that the "Complaint does not allege any facts linking the PBA Defendants to that claim or to show that the PBA Defendants even had knowledge of Plaintiff's CCRB complaint" (the basis for the underlying First Amendment violation) only reaches that conclusion by ignoring the well-pled facts. PBA MOL at 15-16. In fact, the FAC explicitly alleges a basis to believe the PBA Defendants were aware of — and complained of — Plaintiff's CCRB report. According to Darche, things were on track *until* Plaintiff filed the CCRB report. *E.g.*, FAC ¶¶ 89-90. It was only once Plaintiff made the CCRB report that the City said Darche personally fired Plaintiff, because he was "putting too much heat on the agency." *Id.* ¶¶ 117-124. Combined with the admitted conversations with the PBA behind the scenes (Green Ex. 1 at 3), this case does not even resemble the conclusory pleadings in the cases the PBA cites.

## V.    The PBA Defendants' Arguments on Tortious Interference are Misguided.

The elements of a tortious interference with an existing contract claim are: "(a) that a valid contract exists; (b) that a third party had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Finley v Giacobbe*, 79 F.3d 1285, 1294 (2d Cir. 1996) (cleaned up). And for certain employees, as the PBA Defendants note, a plaintiff must also plead "wrongful means *or* malicious intent."[10] PBA MOL at 20 (emphasis added), *citing Critton v. N.Y.*, 12 A.D.3d 216, 217 (1st Dep't 2004).

---

[10] To be clear, while Plaintiff — as the CCRB does colloquially — refers to his employment offer as "probationary" in places, he also alleges the specific details of that probation: the contract was explicitly contingent on — and *only on* — "satisfactory compliance with the terms and conditions of employment of the City of New York Civilian Complaint Review Board," which "include but are not limited to a Department of Investigation Background Investigation." FAC ¶ 34; see also Green Ex. 5. Declaring he failed probation for other reasons was not permitted by the plain language of the contract. And indeed, the City was clear no one ever failed probation. FAC ¶ 38.

15

PBA Defendants only argue Plaintiff's claim fails because (1) he does not plead but for cause; and (2) that he does not plead wrongful means or malice; and (3) of Article 78 exhaustion/time-barred status under Article 78. But first, the PBA's confusion about alternative pleading should be addressed.

### A. The PBA's confusion about alternative pleading is not a basis to dismiss.

The PBA Defendants say, "Plaintiff's allegations are conclusory and inconsistent about why the City terminated him, on the one hand claiming it was because of his criminal history, and on the other hand claiming it was because he filed a CCRB complaint," seeming to suggest this somehow makes both theories implausible. PBA MOL at 21.

But as noted above, Plaintiff is not being inconsistent (or at least, not being inconsistent in a way that matters): He is *explicitly* making alternative arguments. Rule 8 explicitly permits a party to "state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). That is, "a plaintiff may plead two or more statements of a claim, even within the same count, regardless of consistency." *Henry v Daytop Vil.*, 42 F.3d 89, 95 (2d Cir. 1994). It is unclear what it is about this basic rule that the PBA Defendants object to, but whatever their objection, both theories are explicitly pled in the alternative and present no issue under black-letter pleading law.

### B. Plaintiff plausibly pleads but-for cause.

The PBA Defendants say the facts supporting causation are implausible. PBA MOL at 20; at 22. But this argument ignores the FAC, saying, "all that is alleged against the PBA Defendants is a two-sentence comment in a larger article by the *New York Post*." *Id.* Not so. The FAC explicitly alleges, extensively, a course of conduct behind the scenes, saying explicitly "[t]hese efforts — the behind-the-scenes pressure, not a handful of quotes in a Post article and a podcast — were ultimately successful" in getting Plaintiff fired. FAC ¶ 116. And the City has confirmed that the pressure campaign existed and took place over several phone calls. Green Ex. 1 at 3.

16

More, the complaint explicitly pleads that the City would have acted differently *but for* the pressure. Darche repeatedly said his goal was to "figure out a way to get through [the situation] that keeps both of us employed." FAC ¶ 67. The *City's* view was that "society said you're going to pay this debt, and you paid it." *Id.* ¶ 70. And it was working towards a "solution" to mollify the PBA. *Id.* ¶ 90. When firing Plaintiff, the City was clear it was *not* something the City would have done on its own; he was fired because he was "putting too much heat on the agency." *Id.* ¶ 123.

By failing to address the actual facts pled, the PBA Defendants cannot make new arguments on reply. And since the facts actually pled — particularly enhanced by the sworn testimony the City has added — show a plausible conclusion of but-for cause, the PBA Defendants' arguments fail.

### C.  Plaintiff plausibly pleads wrongful means or malice.

Plaintiff has also plausibly pled either wrongful means or malice. While the issue appears not to have been expressly addressed by New York courts, others consistently recognize that "[u]nlawful discrimination or retaliation may be used to demonstrate the malice necessary to ground a tortious interference claim." *Kouvchinov v Parametric Tech. Corp.*, 537 F.3d 62, 70 (1st Cir. 2008). *Accord Weber v FujiFilm Med. Sys. U.S.A.*, 854 F Supp 2d 219, 237 (D Conn 2012) ("these communications could lead a reasonable juror to infer that HLUS and FujiFilm Corporation were motivated by discriminatory animus. There is therefore sufficient evidence for a jury to conclude that HLUS and FujiFilm Corporation acted with malice or wrongful purpose."). The reasoning in those cases is sound: Interfering with a contract or business relationship for unlawfully discriminatory reasons is inherently either malicious or wrongful, in the sense that it lacks a lawful basis or motive.

None of the PBA Defendants' cases suggest otherwise, because none of them address a situation involving tortious interference by coercing unlawful discrimination. And as set out above, Plaintiff has plausibly pled both unlawful discrimination and unlawful retaliation.

### D.  An Article 78 was unnecessary.

17

Last,[11] PBA Defendants argue that because Plaintiff's claims involve his termination by a city agency, his sole source of relief for any of his claims is through a New York State Article 78 proceeding. But Defendants are misguided. Plaintiff brings claims seeking redress for statutorily-proscribed conduct and seeks relief through those statutes. Neither his claims nor his remedies can be resolved through the limited scope of an Article 78 proceeding.

To be clear, Plaintiff **does not** seek reinstatement through his tortious interference claim, or make any claim that would sound in arbitrary and capricious decision making. Rather, pursuant to the Executive Law, which "permits the award of reinstatement and back pay" and has a three-year statute of limitations, he seeks that relief. *Williams v Police Dept. of City of NY Sch. Safety Div.*, 2012 NY Slip Op 33638[U], \*6 (Sup Ct, NY County 2012) (rejecting any application of Article 78). And he seeks ordinary damages for tortious interference.

As a threshold matter, it is unclear if the PBA Defendants have standing to make the Article 78 argument they present. Defendants' cases involved the party that would be the respondent in the hypothetical Article 78 **also** arguing the Article 78 was necessary and prevailing, and doing so for claims that the termination at issue was arbitrary and capricious. *See, e.g., Risley v Rubin*, 272 A.D.2d 198 (1st Dept 2000). But here, the City does not seek that relief, because there is no arbitrary and capricious theory, or other theory that would be appropriately adjudicated in an Article 78.

Accordingly, an Article 78 proceeding could provide no relief. An Article 78 proceeding "'is a form of proceeding available to compel public officials to comply with their responsibilities,' and to 'challeng[e] a specific decision of a state administrative agency.'" *Demaria v NY State Unified Ct. Sys.*,

---

[11] Structurally, this argument appears to only address Plaintiff's tortious interference claims. *See* PBA MOL at 20 (placing this argument structurally under the heading "The Complaint Fails To Plead A Tortious Interference With Contract Claim Against The PBA Defendants"). Accordingly, Plaintiff addresses the argument in that framework. Any attempt to make the same the argument applied to a statutory claim would necessarily fail anyway. *See, e.g., Purcell v. N.Y. Inst. of Tech.-Coll. of Osteopathic Med.*, 931 F.3d 59, 64 (2d Cir. 2019) (no Article 78 required because "New York cannot 'nullify a federal right or cause of action [it] believe[s] is inconsistent with [its] local policies'"); *Williams v Police Dept. of City of NY Sch. Safety Div.*, 2012 NY Slip Op 33638[U], \*6 (Sup Ct, NY County 2012) (similar for Executive Law claims).

18

2024 U.S. Dist. LEXIS 43257, at 14 (SDNY 2024). "The only questions that may be raised in Article 78 proceedings are:

"(1) whether the body or officer failed to perform a duty enjoined upon it by law;

(2) whether the body or officer proceeded, is proceeding or is about to proceed without or in excess of jurisdiction;

(3) whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion or

(4) whether a determination made as a result of a hearing held, and at which evidence was taken, pursuant to direction by law is, on the entire record, supported by substantial evidence."

CPLR 7803.

None of those narrow questions are involved in Plaintiff's claims, and the PBA Defendants do not even try to explain how they would be.  Moreover, the primary remedy that Plaintiff seeks — and the only remedy he seeks for tortious interference — is not available in an Article 78 where damages are available only if they are "*incidental* to the primary relief sought." CPLR 7806 (emphasis added).

Where a plaintiff seeks damages as the principal remedy, as Plaintiff does here, an Article 78 not available. *Finley* at 1291. And courts have found that "[d]amages for civil rights violations are generally not incidental damages recoverable in an Article 78 proceeding." *Razzano v. Remsenburg-Speonk Union Free Sch. Dist.*, No. 11 Civ. 2920 (KAM), 2020 U.S. Dist. LEXIS 181065, 2020 WL 5820327, at *9 (EDNY 2020), *aff'd*, 2022 U.S. App. LEXIS 14644, 2022 WL 1715977 (2d Cir. 2022) (internal quotation marks omitted)); *See also Whitfield v City of NY,* 96 F.4th 504, 529-30 (2d Cir. 2024) (finding that a petition which sought "compensatory damages for violating his rights not to be discriminated against, for violating his constitutional right to freedom of speech… and for loss of all other benefits, advantages and rights…cannot all fairly be characterized as 'incidental' to the Article 78" relief and thus that the "petition sought relief that is not available under Article 78."). Furthermore, damages against Defendants Darche and Hendry in their individual capacities could not be pursued in an Article 78 proceeding. *See Finley supra,* n 6. Since Plaintiff could not have pursued any

19

of his claims through Article 78 against the City (and the City does not even argue he could have), he cannot have been required to file a meritless Article 78 before seeking relief against the PBA Defendants.

**VI.  <u>Plaintiff's Right to Record Act Claims Against the City and Defendant Hendry are Plausible.</u>**

The City and State Right to Record Acts (the "Acts") create a private right of action when a person records or attempts to record law enforcement activity and "an officer intervene[s] with such person's recording of police activities." City and PBA Defendants' arguments rest on three points: One, that the Acts are inapplicable to the PBA and City Defendants because they were not acting in their capacity as officers; two, that the Acts do not protect against the retaliatory conduct Plaintiff alleges; and three, that the CCRB Report is not a recording under the law. These arguments demand a "cramped reading" of the Acts that runs afoul of the plain language and the clear legislative purpose and would produce an absurd result. *See Lubonty v US Bank N.A.*, 34 N.Y.3d 250, 255 (NY 2019). The arguments also rest on a misreading of the complaint.

To clarify, Plaintiff seeks relief under the Acts against the City (through *respondeat*) and Hendry (personally).[12] Each of them violated Plaintiff's rights under the Acts in at least one of the two non-exclusive ways:

    i.    by retaliating against Plaintiff in response to his contemporaneous recording of the police activity, made known to Defendants when Plaintiff filed a CCRB report; or

    ii.    by retaliating against Plaintiff in response to the CCRB report, a protected "recording" under the Acts.

> **A.  Defendant Hendry and other members of the NYPD are plausibly officers under the Acts.**

---

[12] Plaintiff does not make Right to Record Act claims against the PBA as a corporation directly.

An officer's interference is actionable without reference to whether the ***interference*** took place while he was engaged in a law enforcement activity, as long as ***the recording*** was of law enforcement activity.  Though the PBA argues otherwise, this has to be true: If it were otherwise, evading liability for interfering with recording would be simple, and the Acts would do very little.

Under the City Act, the PBA's argument is foreclosed by plain text.  The City Right to Record Act defines an "officer" as "any peace officer or police officer as defined in the criminal procedure law who is employed by the city of New York, or any special patrolman appointed by the police commissioner pursuant to section 14-106." N.Y.C. Admin. C. § 14-189 (a). Under the City Act, actionable interference is not limited by the capacity in which the officer is acting in effectuating the interference. In contrast, the protections of the Acts only apply to recordings of "police activities," defined as "an activity of an officer acting under the color of law."  That is, if an officer interferes with recording of police activity ***ever***, it does not matter if he is off-duty — or the City attempts to disclaim his conduct — when he does.

PBA Defendants assert that because "the FAC does not allege any conduct by [Hendry] in his capacity as an officer or otherwise in a law enforcement context," neither Act applies. That is, they argue, to be actionable, the ***interference itself*** must be "in a law enforcement context."  PBA MOL at 19. But that is not what the City Act says.  The FAC tracks all that the City Act requires:

- Plaintiff ***recorded*** "[p]olice activities," meaning "any activity of an officer acting under the color of law," triggering the Act (§ 14-189(a));

- Hendry is an "officer," where that "means any peace officer or police officer as defined in the criminal procedure law who is employed by the city of New York" (*id.*); and

- The complaint alleges that by retaliating for Plaintiff's CCRB complaint, Hendry was (among other things) "threatening or making any effort to intimidate a person recording police activities" (§ 14-189(c)(1)(b));

21

That's all the City Act requires for liability. No requirement that the interference itself be clothed in state law exists in the text, and the PBA Defendants, by only quoting the State Act, do not argue an atextual basis for one.

Meanwhile, the State Act — while it defines its terms differently than the City Act — is not reasonably subject to Defendants' reading. If officers could simply step off duty to retaliate against people who recorded, the Acts would do little. Indeed, they would likely not even address one of the principal evils they were passed to address: Retaliation against the people who recorded events like the murder of Eric Garner.[13] Consider the examples the legislature discussed. In debating both Acts, Eric Garner's murder was front and center. And as everyone knew, the person who *filmed* Eric Garner's murder had his life upended by retaliation. For example, during the State debate:

> "this bill, along with probably this package, would not probably -- wouldn't be in existence if not for two people. That was Ramsey Orta, who was the whistleblower who would video record a member of the NYPD strangle Eric Garner back in 2014. … . If those two individuals did not have the ability -- and may I add, Mr. Orta paid a -- *a very dear price for that through the retribution of others in higher places - but if [he] had not recorded [those] events, we would not be here passing this package of bills.*"

Green Ex. 4 at 128 (as paginated) (emphasis added). It cannot be that a law essentially designed to protect the people who filmed the murders of Eric Garner and others would not even protect them from the precise retaliation and "interference" the legislature was attempting to bar.

Moreover, by participating in retaliation for recording official activity, it is plausible Hendry *was* exercising some part of his cloak of state power. *McAuliffe v Pomposello*, 2011 U.S. Dist. LEXIS 115837, at *10 (SDNY Oct. 3, 2011) (finding that "[a]lthough it is undisputed that [the defendant] was off duty when the alleged events occurred, there is evidence in the record from which a reasonable jury could

---

[13] Because the City Act does not contain the limitation the PBA argues, and the Acts are otherwise coextensive, the Court may wish to simply allow Plaintiff to proceed on the City Act claim for efficiency to avoid passing on the (slightly) more ambiguous structure of the State Act.

conclude that [he] invoked the real or apparent power of the MTA police department on the night in question.").

In short, Defendant Patrick Hendry is an active-duty police officer, along with more than 21,000 members of the PBA.[14] *See* MOL at ECF 39, at 19. Under the City Act, it is irrelevant whether Hendry's interference was done in his capacity as a law enforcement officer — because the complaint alleges that the activity interfered with was recording the "activity of an officer acting under the color of law." § 14-189(a).

Meanwhile, as to the City, Hendry's conduct would also give rise to liability through *respondeat superior*. And the complaint plausibly pleads interference by City employees who are officers, for whose conduct the City would also be liable. The FAC plausibly pleads that the individual officers who were the subject of Plaintiff's Report, for example, or still other people at the PBA, were involved in taking adverse actions against Plaintiff because of the Report — at least (and in the alternative) if Plaintiff was not fired for his conviction.

### B. The Acts prohibit a wide range of interference, including post-recording retaliation.

PBA Defendants argue that the Right to Record Acts do not protect against retaliation. City Defendants attempt to argue that the Acts do not protect against retaliation in the employment context. As explained below, both arguments fail.

The Acts prohibit any conduct that "interfere[s] with … recording of a law enforcement activity," in any way, "including but not limited to" certain, enumerated examples. § 79-P(3); *accord* § 14-189(a) (claim exists where "an officer interfered with such person's recording of police activities," and "interference includes but is not limited to the following actions"). One of those examples is "stopping, seizing, searching, ticketing, or arresting that person *because* that person recorded a law

---

[14] https://www.nycpba.org/about/#

enforcement activity." *Id.* (emphasis added). PBA Defendants' argument is therefore puzzling, as the text of the statute does indeed include retaliation as an example of a form of actionable interference. Although the Acts do not name the precise (and frankly uncommon) form of post-recording retaliation which Plaintiff was subjected to——that officers conspired to have him terminated from his employment at a City agency which they had unique leverage to exert pressure upon—the Acts do not purport to proscribe only specific forms of interference. *See Matter of Wyandanch Union Free Sch. Dist. v Town of Babylon Indus. Dev. Agency*, ___AD3d___, 2026 NY Slip Op 00252, 12 (2d Dept, 2026) (holding the plain and unambiguous language of the provision "including, but not limited to" expressly provides and expects that the listed examples would not be exhaustive) (collecting cases). Given the intent of the statute, it is hard to imagine carving out retaliation in any form was intended by either legislative body.

And under black-letter Second Circuit law "interference" with a right includes retaliation for its exercise. For example, the FMLA prohibits "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" under the FMLA.  29 U.S.C. § 2615(a)(1). And it then defines "[I]nterference" with FMLA proceeding as including "discharge" and other "discrimin[ation]" because of the filing of claims.  29 U.S.C. § 2615(b). But the Second Circuit has long used "retaliation" as shorthand for such "Interference" when it amounts to "discriminating against employees or prospective employees who have used FMLA leave."  *Potenza v City of NY*, 365 F.3d 165, 167 (2d Cir. 2004). Of course, this makes sense. Retaliation is a kind of interference; and it is designed to deter **others** from exercising the same right.

Here too, the legislature barred **all** "interference" with the Right to Record, full stop.

Meanwhile, the City is right in the sense that **Darche** — since he is not an "officer" — could not give retaliate in the relevant sense. But the FAC plausibly alleges that officers (including Hendry) engaged in interference (by retaliation). And pressuring a person's employer to fire them **because** of

24

a recording obviously interferes with recording in the same sense that "discriminating against employees or prospective employees who have used FMLA leave" interferes with FMLA leave. *Potenza*, 365 F3d at 167. So Plaintiff plausibly pleads the City is liable for that conduct through *respondeat superior*, under conventional *respondeat* principles (and the City does not argue those principles do not apply).

### C. A CCRB report and the notes allowing someone to file such a report are both "Recordings" under the Acts.

Under the Acts, "'Record' means to capture or attempt to capture any moving or still image, sound, or impression through the use of any recording device, camera, or any other device capable of capturing audio, moving or still images, *or by way of written notes or observations*." § 14-189(a); § 79-P(1)(c) (emphasis added). When Plaintiff observed the police engaging in what he perceived to be misconduct on December 9, 2024, he made written notes detailing the descriptions of the officers. FAC ¶ 105. This was, unambiguously, a recording under the Acts—and neither Defendant argues otherwise. *See* FAC ¶¶ 105; 235-236.

On that same day, Plaintiff filed a CCRB Report made up of those written notes. *Id.* The Report, in addition to the contemporaneous notes, were another "attempt to capture" Plaintiff's "impression…by way of written notes or observations." The Acts do not limit how many recordings can be captured in the course of an observation, or on the forms of recording. Nor do the Acts limit Recordings to contemporaneous ones. Defendants have no basis to insist that the Report is not a Recording. Indeed, such a finding would be inconsistent with the legislative intent of the Acts which, in the wake of police violence that sparked nationwide protests, recognized the unique value in recording police misconduct for the precise purpose of public accountability through the sharing of that recording. *See* Section Point VI(A), above.

### D. The complaint plausibly alleges Defendants retaliated against Plaintiff for the contemporaneous recording itself.

25

Finally, Plaintiff pleads in the alternative that when he filed the CCRB complaint, Defendants learned of his contemporaneous recording. FAC ¶129. This is plausible, given that PBA Defendants seem to have learned when Plaintiff sat in on a police interview and contacted Defendant Darche to reiterate their demands. And Defendant Darche obliged. He instructed Plaintiff that to keep his job, Plaintiff should move to a "field" investigator position where he would have no contact with police officers. FAC ¶ 73. And Darche then reported his compliance to the PBA. Green Ex. 1 at 3.

The FAC, read favorably to Plaintiff, pleads that when the PBA Defendants learned about Plaintiff's recording of police activity and of his related CCRB report, it decided it could no longer live with him in *any* role at the CCRB, and made that known. Given Defendant Darche's stated concerns for his ability to keep his own job, it is plausible that he decided, in agreement with PBA Defendants, that he would terminate Plaintiff. FAC ¶¶ 67-68.

## VII. <u>The First Amendment Does Not Insulate the PBA Defendants' Relevant Conduct Here.</u>

PBA Defendants insist that any public pressure they exerted upon the City to terminate Plaintiff is shielded by the First Amendment, including by the *Noerr-Pennington* Doctrine. But the First Amendment does not apply here, as Plaintiff does not assert an independent cause of action based on PBA Defendants' public statements alone. *See* FAC ¶ 56.

"[C]ourts have long recognized that there is no constitutional problem with using offensive speech as evidence of motive or intent." *Gartenberg v Cooper Union for the Advancement of Sci. & Art*, 765 F Supp 3d 245, 267 (SDNY 2025) (alterations accepted; collecting cases). Plaintiff makes claims specifically about conduct (*see especially*, Green Ex. 1 at 3), and uses Defendants' public speech merely as "evidence of motive or intent." *Id.* The PBA's argument otherwise is simply wrong. The First Amendment neither "bar[s] using…speech to demonstrate a [defendant's] discriminatory motive" nor "protect[s] a conspiracy from punishment because speech is used to effect the crime." *United States v Caronia*, 703 F.3d 149, 175 (2d Cir. 2012) (quoting *Wisconsin v. Mitchell*, 508 US 476 at

490 (1993); See also id. at 489; *United States v. Stromberg*, 22 F.R.D. 513, 521 (SDNY 1957); *See also United States v Van Hise*, 2013 U.S. Dist. LEXIS 181894, at 10 (SDNY 2013) (collecting cases). Defendants cite no cases to contradict that well settled doctrine.

Nor is what the FAC alleges pure, protected speech. Courts have long been clear that directly assisting in unlawful conduct — even in forums for traditional speech like books — is not protected. *See, e.g., United States v. Rowlee*, 899 F.2d 1275, 1280 (2d Cir. 1990) (advice on preparing false tax returns); *United States v. Freeman*, 761 F.2d 549, 551–52 (9th Cir. 1985) (holding aiding-and-abetting liability possible even if the speech "spring[s] from the anterior motive to effect political or social change").[15] The FAC alleges the PBA Defendants incited City officials — who otherwise **would not have violated the Executive Law** — to fire Plaintiff because of his conviction. And the underlying violation of the Executive Law has not even been challenged. That is, the PBA Defendants incited violations of the law, which took place imminently — and unlike many cases on incitement, there is no question on imminence, because the violations in fact came to pass, immediately.

More, *Noerr-Pennington* simply does not apply because the place the PBA Defendants say it applies — to the comments to the New York Post — is not the asserted basis for liability. *See Clinton v Brown & Williamson Holdings, Inc.*, 2013 U.S. Dist. LEXIS 87204, at 35 (SDNY June 20, 2013) (finding that although the First Amendment and the *Noerr-Pennington* doctrine protects efforts to influence governmental action, the lower court's decision not to instruct the jury on these doctrines was not error because Plaintiff's claim was not based on this lobbying activity.)

Again, Plaintiff alleges a conspiracy, executed via private communications between City Defendants and PBA Defendants. The City has confirmed those private communications — not

---

[15] *See also, well,* J. Remy Green, *Digitizing Brandenburg: Common Law Drift Toward a Causal Theory of Imminence*, 69 Syracuse L. Rev. 351 (2019).

public lobbying — took place. Green Ex. 1 at 3. Though civil liability is at issue, the law prohibits attempts to compel an employer to fire someone because of a criminal conviction — and does so specifically so actors like the PBA will not do what is alleged here. Put simply, "speech is not protected by the First Amendment when it is the very vehicle of the crime itself." *United States v. Rowlee*, 899 F.2d 1275 (2d Cir. 1990) (citing *United States v. Varani*, 435 F.2d 758, 762 (6th Cir. 1970)). Conspiracy to violate the law is "not protected by the First Amendment merely because, in part, it may have involved the use of language." *Id.* at 1278.

Nor do *Noerr-Pennington* cases suggest otherwise. "Of course, even the *Noerr-Pennington* doctrine does not grant unlimited license to those who wish, for allegedly discriminatory reasons, to exercise their right to petition." *See Mosdos Chofetz Chaim, Inc. v Vil. of Wesley Hills*, 701 F Supp 2d 568, 597 (SDNY 2010). The doctrine's protections do not extend to activity intended solely to "[commit] a wrongful act." *Fox News Network v Time Warner*, 962 F Supp 339, 346 (EDNY 1997). And this makes sense. Otherwise, as this Court has emphasized in denying a motion to dismiss on *Noerr-Pennington* grounds, *"*allow[ing] individuals to avail themselves of first amendment protections when it is alleged that their conduct will lead to official misconduct in violation of the United States Constitution would defeat the purpose of the civil rights laws." *Leblanc-Sternberg v. Fletcher*, 781 F Supp 261, 267 (SDNY 1991). And in cases like this one, "the decision about whether" *Noerr-Pennington* "applies should be left until after discovery, so as to 'more fully develop the underlying acts and possibly establish an exception….'" *Fox News Network v Time Warner*, 962 F Supp 339, 346 (EDNY 1997) (citing *P.& B. Marina, Lee Pokoik v. Logrande*, 136 F.R.D. 50, 61 n.9 (EDNY 1991).

## VIII.    The Court Should Grant Plaintiff's Cross-Motion to Amend

Under Federal Rule of Civil Procedure 15(a)(2), a court should freely grant a party leave to amend "when justice so requires." *Newton v LVMH Moet Hennessy Louis Vuitton Inc.*, 2025 US Dist LEXIS 126427, at *9 (SDNY July 2, 2025). A Court may deny leave to amend "for good reason, including

28

futility, bad faith, undue delay, or undue prejudice to the opposing party." *Id.* (internal quotations omitted; *See also Cohen v Am. Airlines, Inc.*, 13 F.4th 240, 247 (2d Cir 2021) (finding that a motion to amend was properly denied where the court found that it was made solely to avoid a statute of limitations, and thus was made in bad faith). Here, Plaintiff moves to amend to include facts not known to him until the initial exchange of discovery.  And the parties expressly understood that part of the purpose of Phase I discovery here was to exchange discovery that would be "informative regarding issues in the union motions to dismiss." ECF No. 31 at 3.

As Plaintiff had no way of obtaining this information before the exchange of discovery and only learned of the information after making his first amendments, there is no undue delay or bad faith here. And as the amendments would assist the Court in assessing the merits of Plaintiff's claims, they would not be futile.

## CONCLUSION

For all the reasons discussed above, Plaintiffs ask the Court to deny PBA Defendants and the

City of New York's Motions to Dismiss in full.

Dated:    March 27, 2026
          Queens, New York


                                                    Respectfully submitted,


                                                    **COHEN&GREEN P.L.L.C.**


                                                    By:    _____/s/_____
                                                    J. Remy Green
                                                    Leena Mohmoud Widdi

                                                    1639 Centre Street, Suite 216
                                                    Ridgewood (Queens), NY 11385
                                                        t: (929) 888-9480
                                                        f: (929) 888-9457
                                                        e: remy@femmelaw.com

                                                    **GIDEON ORION OLIVER**
                                                    277 Broadway, Suite 1501
                                                    New York, NY 10007
                                                    t: 718-783-3682

30

## WORD COUNT CERTIFICATION

Pursuant to Local Rule 7.1 and Rule 5 of this Court's Individual Practice Rules, and the Court's

Order at ECF No. 50, I certify that the word count of this memorandum of law is 10,528 exclusive of

the caption, table of contents, table of authorities, and signature blocks.


Dated:    March 27, 2026
Queens, New York


COHEN&GREEN P.L.L.C.


/s/
By: _____
J. Remy Green

31