UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X    Case No.: 25-cv-08065

RONALD DAVIDSON,

                    Plaintiff,

          -against-

THE CITY OF NEW YORK, JONATHAN DARCHE,
SERGEANTS BENEVOLENT ASSOCIATION, VINCENT
VALLELONG,[1] POLICE BENEVOLENT ASSOCIATION
OF THE CITY OF NEW YORK, AND PATRICK HENDRY;

                    Defendants.

---------------------------------------------------------------------X

**~~FIRST~~ SECOND AMENDED COMPLAINT**

**PLAINTIFF DEMANDS A TRIAL BY JURY**

    Plaintiff, RONALD DAVIDSON, by his attorneys, COHEN&GREEN P.L.L.C., hereby

complains of the defendants, upon information and belief, as follows:

**PARTIES, VENUE AND JURISDICTION**

    1.    At all times mentioned herein, plaintiff, Ronald Davidson (Mr. Davidson; he/him),

was an adult resident of the State of New York.

    2.    At all relevant times mentioned herein, defendant, City of New York,[2] was and is a

municipal corporation duly organized and existing under and by virtue of the laws of the State of

New York and acts by and through its agencies, employees and agents, including, but not limited

to, the New York City Police Department ("NYPD"), and their employees.

    3.    At all times hereinafter mentioned, defendant Jonathan Darche was and is a natural

person who is the executive director of the CCRB, and an employee of the City. Defendant Darche

is sued herein in his official and individual capacities.

---

[1] The SBA and Vallelong have been dismissed by stipulation. This Second Amended Complaint leaves the text referencing them in for consistency between complaints given the pending motions, but does not intend to re-add them as parties, and intends the stipulation entered to continue to govern.

[2] The Civilian Complaint Review Board ("CCRB") is not a suable entity; to the extent any claim herein requires naming the CCRB directly, Plaintiff intends naming the City to cover the CCRB as well.

4. At all times hereinafter mentioned, defendant Sergeants Benevolent Association ("SBA") was a corporation with a principle place of business at 35 Worth Street, New York, NY 10013.

5. At all times hereinafter mentioned, defendant Vincent Vallelong was and is a natural person who is the head of the SBA. Defendant Vallelong is sued in his individual capacity. Upon information and belief, and as set out below, Defendant Vallelong was personally responsible for the actions and choices made by the SBA alleged herein.

6. At all times hereinafter mentioned, defendant Police Benevolent Association of the City of New York ("PBA") was a corporation with a principle place of business at 125 Broad St, 11th Flr., New York, NY 10004-2400.

7. At all times hereinafter mentioned, defendant Patrick Hendry was and is a natural person who is the head of the PBA. Defendant Hendry is sued in his individual capacity. Upon information and belief, and as set out below, Defendant Hendry was personally responsible for the actions and choices made by the PBA alleged herein.

8. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367, and 42 U.S.C. § 1983.

9. Venue is proper pursuant to 28 U.S.C. § 1391, et seq., in the Southern District of New York, as it is where the majority of the acts alleged herein took place.

**RELEVANT FACTS**

10. As set out below, Plaintiff was convicted of a serious crime. But he served his time, turned his life around, and entered public service to give back to the community and the City.

11. However, because of Plaintiff's background and specific acts in documenting and reporting police misconduct the SBA and PBA pressured the City to unconstitutionally and

2

unlawfully retaliate against Plaintiff.

12.    And unfortunately, the very City organization designed to document and eliminate such rank corruption — the CCRB — played along, cooperating to deny Plaintiff his rights.

13.    Thus, and as set out below, Plaintiff seeks relief — including through the Ku Klux Klan Act — for the CCRB, SBA, and PBA's violation of Plaintiff's constitutional and civil rights.

***Background on Police Union Leadership***

14.    Under the SBA's bylaws, only people who actively "hold the rank of Sergeant in the Police Department - City of New York" may be members at all.  SBA Const., Art. III, sect. 1.

15.    To stand for any office in the SBA, a person must be an "Active member in good standing and seeking the office," and accordingly be a member of the NYPD (though retired officers may maintain membership, and presumably stand for the presidency).  *Id.* Art. V, sect. 2.

16.    The PBA's constitution or other governing document is not public.

17.    However, all of its current board and past presidents are — upon information and belief — current or former members of the NYPD.

18.    The unions each have an extensive legal relationship with the City of New York and the NYPD.

19.    In acting ***as part of the police unions***, the unions' presidents and members do not act as purely private citizens; they act necessarily as members of the NYPD, with privileges and rights not afforded to private citizens.

20.    The police unions have legal leverage and powers that ordinary citizens do not.

21.    When police unions make demands ***as police unions***, those demands are not idle discussion in the marketplace of ideas, they are (at least, quite often) legal assertions of authority with implicit (or explicit) threats to take actions available exclusively to police unions.

3

22.    Defendants Vallelong and Hendry could not have their roles without their official capacities as members of the NYPD.

***Background on Plaintiff's conviction***

23.    In 1972, when he was 17, Plaintiff was convicted of a triple homicide.  The men he killed were assaulting and attempting to rob him at knifepoint, and Plaintiff was on anabolic steroids at the time.

24.    For his crime, Plaintiff spent 43 years in prison.

25.    While incarcerated, Plaintiff earned his bachelor's degree in Community and Human Services.

26.    And after release in 2016, Plaintiff took two security courses aimed at learning the trade of being a security guard, re-entry courses at John Jay, and obtained certificates of fitness from the FDNY.

***Plaintiff is Hired by the CCRB***

27.    On August 30, 2024, the CCRB formally offered Plaintiff a position of "Investigator – Level 1."

28.    For that position, the starting salary offered was $47,601 per annum.

29.    The position was to start on October 21, 2024.

30.    At that time, the CCRB was fully aware of Plaintiff's background and conviction.

31.    Plaintiff discussed the conviction — and his rehabilitation — with CCRB interviewers in the hiring process.

32.    The CCRB — rightly — saw Plaintiff as a citizen trying to give back to the City.

33.    And, on paper, the CCRB has a policy that it "does not discriminate in the hiring

process based off of prior criminal history."[3]

34.    Plaintiff's continued employment was contingent only on "satisfactory compliance with the terms and conditions of employment of the City of New York Civilian Complaint Review Board," which "include but are not limited to a Department of Investigation Background Investigation."

***Plaintiff Complies with All Terms and Conditions of Employment.***

35.    At all times, Plaintiff complied fully with every term and condition of employment at the CCRB.

36.    Plaintiff passed the background check — and the CCRB made the offer knowing of Plaintiff's conviction.

37.    The CCRB typically holds a test for probationary employees during the ninth week of training.

38.    One trainer told Plaintiff, in sum and substance, "no one fails the test."

39.    However, as detailed below, Plaintiff was fired during the eighth week of his probation.

***The SBA and PBA Discover Plaintiff's Hiring and Retaliate.***

40.    Plaintiff's hiring, however, caused outrage at the City's police unions.

41.    Immediately upon discovering Plaintiff was hired, they began to plan to retaliate.

41.42.    Just days after Plaintiff started at the CCRB, on or about November 1, 2024, Fred Vasselman, counsel for the PBA Defendants, on a phone call, asked Defendant Darche if he knew that the CCRB had hired someone who had been convicted of murder, in reference to Plaintiff.

---

[3] A CCRB representative was quoted as saying this in Larry Celona et al., *Bronx man once convicted of triple murder, passed over by NYU for security job lands gig with NYPD watchdog,* N.Y. Post (Nov. 27, 2024), *available at* https://nypost.com/2024/11/27/us-news/bronx-man-once-convicted-of-triple-murder-passed-over-by-nyu-for-security-job-lands-gig-with-nypd-watchdog/ ("N.Y. Post Article").

5

42.43. The head of the SBA — Defendant Vallelong — declared: "He was convicted of three homicides, so he should be disqualified from doing any investigations involving the NYPD and its members." N.Y. Post Article.

43.44. He also declared Plaintiff "should not have access to sensitive materials involving victims." *Id.*

44.45. Vallelong's sole objection was Plaintiff's prior conviction.

45.46. Vallelong personally or through a subordinate caused SBA to protest Plaintiff's participation in a specific case.

46.47. The City, because of Defendant Vallelong and Defendant SBA's actions, removed Plaintiff from that case.

47.48. Vallelong's demand — because of the nature of the CCRB's work — was a demand that Plaintiff not be allowed to work at the CCRB.

48.49. As further set out below, New York law prohibits firing "by reason of [a person] having been convicted of one or more criminal offenses." N.Y. Hum. R. L. § 296(15).

49.50. Vallelong and the SBA knew their demands were unlawful, and intended to demand that the CCRB violate the law.

50.51. Apparently recognizing that, at the same time as essentially demanding his firing, Vallelong offered a non-existent caveat, declaring: "We will protest every time he is scheduled to sit in on a case against one of our members" and "If CCRB wants to hire him, they should do it for another position." N.Y. Post Article.

51.52. The head of the PBA — Defendant Hendry — declared: "Police officers should not be subjected to the judgment of someone who was convicted of three murder[.] Moreover, the NYPD should not be turning over mass amounts of sensitive law enforcement information to

6

someone with this kind of criminal record." N.Y. Post Article.

52.53. He also declared: ""If this individual has *any role in CCRB's investigations*, it not only jeopardizes our members' rights — it puts public safety at risk. It's up to the NYPD to ensure that doesn't happen."  N.Y. Post Article (emphasis added).

53.54. Hendry and the PBA knew their demands were unlawful, and intended to demand that the CCRB violate the law.

54.55. Indeed, Defendant Hendry's statement lacked even the fig leaf caveat Defendant Vallelong's had:  Hendry said if the City tried to allow Plaintiff "any role" at all at the CCRB the PBA would "ensure that doesn't happen."

55.56. Defendants ultimately achieved that aim.

56.57. To be clear, as set out in more depth below, it is not the comments to the Post that Plaintiff is suing over.  Rather, these comments are context that reveals the intention driving non-public advocacy the union Defendants engaged in.

57.58. Moreover, the union Defendants' "advocacy" was *not* restricted to advocating a change in law:  That is, they did not advocate *making* it legal to fire Plaintiff because of his convictions.

58.59. Rather, they demanded imminent, lawless action:  Firing Plaintiff *because* "He was convicted of three homicides.  N.Y. Post Article.

59.60. And the fact that such lawless action happened almost immediately shows it was imminent.

***Plaintiff attempts to do his job, while the unions conspire to force the City to fire him.***

60.61. Plaintiff worked at the CCRB for eight weeks of intensive training.

61.62. Plaintiff worked well during training, got along well with the cohort and

supervisors.

62.63. Plaintiff received uniformly positive feedback — except for the comments about "heat" and other pressure from the PBA and SBA detailed below.

63.64. The training period at the CCRB is nine weeks, after which a test takes place, and then trainees are assigned caseloads.

***December 3, 2024 Conversation between Plaintiff and Darche.***

65. Prior to that meeting, at some point in October or November 2024, Fred Vasselman or Stuart London, counsel for the PBA, called Jonathan Darche after Plaintiff sat in an officer interview.

66. Upon information and belief, during that call, PBA Defendants communicated threats and demands that Plaintiff be terminated.

64.67. On December 3, 20245, Defendant Darche called Plaintiff in into his office for a meeting.

65. During that meeting, Defendant Darche indicated he wanted to discuss with Plaintiff the comments and complaints of the police unions.

66.68. Darche described, in sum and substance, that this was "an uglier situation than I hoped."

67.69. Darche said, in sum and substance, at that time his goal was to "figure out a way to get through [the situation] that keeps both of us employed."

68.70. Darche stated, in sum and substance, that Plaintiff was "probably collateral damage in someone taking a shot at me [e.g., Darche]."

69.71. Darche stated, in sum and substance, "In the end, you didn't do anything wrong recently."

70.72.  Darche said, in sum and substance, of Plaintiff's conviction, "society said you're going to pay this debt, and you paid it."

71.73.  Darche said, in sum and substance, "if you don't pass the test, there's going to be a lot of pressure on me to fire you" and that even if Plaintiff *did* pass the test, "[t]here's still going to be a lot of pressure on me to fire you."

72.  During the conversation, Darche asked — and Plaintiff agreed — that Plaintiff agree to work primarily as a "Field" investigator, rather than in a role where he would directly interact with police facing CCRB complaints.

73.74.  Darche stated, in sum and substance, he thought it would be "enough that …[Plaintiff was] not interviewing cops" and "not writing closing reports," even if his title was "investigator."

74.75.  Darche also stated, in sum and substance, that even if Plaintiff *didn't* pass the test, he would be placed "somewhere in outreach," with "100%" the same pay.

75.76.  Darche directed, in sum and substance, that Plaintiff should sit in on civilian interviews, so he did not need to sit in on officer interviews, and continue his training.

76.77.  Darche then said, in sum and substance, "I plan tell them" — defining "them" as "everyone" including the PBA, SBA, and Mayor's office — "as little as possible to get them off my back."

77.78.  Darche said, in sum and substance, "my hunch is that it's the PBA that went to the [N.Y.] Post, or the PBA went to the SBA, and the SBA went to the Post."

78.79.  The general tenor and message conveyed to Plaintiff was that Darche was under a lot of pressure to illegally fire Plaintiff because of Plaintiff's conviction.

80.  But Darche assured Plaintiff he would not be illegally fired, and asked for

9

cooperation in keeping his profile low, so that the PBA and SBA could not take "shots" at Darche through Plaintiff.

81.    Upon information and belief, Darche instructed Plaintiff to comply with a change to his role in response to pressure and threats from the PBA, communicated to Darche during his phone call with PBA counsel in October or November 2024.

79.82.  After Plaintiff agreed to that change, Defendant Darche spoke to counsel for PBA by phone and informed PBA Defendants that Plaintiff had been transferred to the role of field investigator.

***December 6, 2024 Conversation between Plaintiff and Darche.***

80.83.  As on December 3, in a conversation on December 6, 2024, Plaintiff and Darche discussed the union Defendants' efforts to get the City to fire Plaintiff.

81.84.  During this meeting, Defendant Darche referred to getting Plaintiff through the probation process as "landing this plane."

82.85.  Defendant Darche stated that Plaintiff needed to "not rock the boat," meaning he needed to avoid the unions' ire and press tactics.

83.86.  The CCRB's executive board meets on a monthly basis, which coincides with a monthly agency public meeting where members of the public are permitted to speak.

84.87.  Plaintiff had attended two of those meetings — along with some of his CCRB cohort — during his training.

85.88.  Defendants SBA and PBA took umbrage with the fact that Plaintiff had sat in the back of the meetings — as all ordinary citizens are entitled to do.

86.89.  Darche also noted that he had been "getting emails from people who saw the Post article."

10

87.90.  Darche also noted that certain union members had been on a podcast complaining about Plaintiff.

88.91.  Darche's message to Plaintiff, in sum and substance, was that he needed to lie low, but that he was not going to be fired.

89.92.  Defendant Darche stated, in sum and substance, in calling Plaintiff into the meeting, "I didn't want you to freak out like, 'oh, I'm getting fired.'"

90.93.  Defendant Darche said, in sum and substance, that "I think we have a solution" to the unions' attacks, which was for Plaintiff not to attend public CCRB meetings.

***Plaintiff reports misconduct.***

91.94.  On or about December 9, 2024, Plaintiff exited the subway at the Chambers Street station on his way to work.

92.95.  Plaintiff saw four members of the NYPD's SRG Unit and two regular officers engaged in what he perceived as misconduct.

93.96.  Plaintiff politely asked them for their business cards and identification.

94.97.  Plaintiff is entitled, by law, to make that request.

95.98.  The officers ignored him and refused to provide their business cards.

96.99.  After Plaintiff requested several times, one of the SRG officers said, "I don't have any cards."

97.100.      The other officers nodded approvingly.

98.101.      Plaintiff then stated, in sum and substance, "if you don't have any cards, can you please write your name, shield number, and command on a piece of paper."

99.102.      NYPD's Patrol Guide and the Right to Know Act require officers to provide business cards, and when business cards are unavailable, to write their name, shield number, and

command on a piece of paper.

100.103.      The CCRB had, in fact, trained Plaintiff on the Right to Know Act and what members of the NYPD are required to provide to members of the public when asked.

101.104.      At no point in time did Plaintiff indicate that his request had anything to do with his duties as a CCRB investigator.

102.105.      When asked to write down information, the same officer stated, in sum and substance, "I don't have any paper."

103.106.      The officer's tone was sarcastic.

104.107.      The other officers nodded approvingly.

105.108.      Plaintiff accordingly wrote down descriptions of the officers — making a "recording" in the sense of the Right to Record Acts.

106.109.      Plaintiff filed a CCRB complaint about the conduct.

107.110.      Plaintiff specified their physical description, based on his training on what the CCRB requires to identify people.

108.111.      Plaintiff did so as a citizen of New York City.

***Throughout this period, the unions engage in a private, pressure campaign to have Plaintiff fired.***

112.   Beginning with Plaintiff's mere hiring, and continuing through his firing (discussed below), the union Defendants engaged in a private pressure campaign to force the City to unlawfully fire Plaintiff.

113.   That campaign was effectuated at least in part, through five phone calls between PBA Defendants and City Defendants:

    a.   On or about November 1, 2024, Fred Vasselman, counsel for the PBA, on a phone call, asked Jonathan Darche if he knew that the CCRB had hired someone who had

12

been convicted of murder, in reference to Plaintiff.

b. During October or November 2024, Fred Vasselman or Stuart London, counsel for the PBA, called Jonathan Darche after Plaintiff sat in an officer interview.

c. During November or December 2024, Jonathan Darche spoke to either Fred Vasselman or Stuart London, counsel for PBA, and informed that individual that Plaintiff had been transferred to the role of field investigator.

d. On or about December 10 and 12, 2024, Jonathan Darche called Fred Vasselman and Vincent Vallelong, respectively, and informed Vasselman and Vallelong that Plaintiff was no longer employed by the CCRB.

**Formatted**

109.114. Upon information and belief, during those phone calls, PBA Defendants communicated threats and demands and that Plaintiff be terminated, and City Defendants made repeated concessions, ultimately leading to an agreement that Plaintiff be terminated. A general description of those phone calls is as follows:

110.115. While Defendant Vallelong was careful in his public comments, Defendant Hendry was not, declaring: "If this individual has *any role* in CCRB's investigations, it not only jeopardizes our members' rights — it puts public safety at risk. It's up to the NYPD to ensure that doesn't happen." N.Y. Post Article (emphasis added).

111.116. That is, the design of the campaign was not to move Plaintiff to some different role, but to get him out entirely.

112.117. And Defendant Hendry also revealed what was going to be done: In saying, "[i]t's up to the NYPD to ensure that doesn't happen," he included himself and the unions in "NYPD." So it was the unions who would act "to ensure" Plaintiff no longer had a job.

113.118. As detailed elsewhere herein, among other things, by way of context:

a. The Union Defendants objected to Plaintiff being employed at all at the CCRB: Plaintiff "was convicted of three homicides, *so he should be disqualified*." N.Y. Post Article (emphasis added);

b. Darche and other City employees made repeated reference to "heat," "pressure," and the like from the unions (*see, e.g.,* ¶¶ 6362, 7371, 7776-7877, 8380-82, 128123-130125, infra);

c. The unions' efforts, like coordinated union efforts in the past (*see* 188181-210203, above), were not limited to public comments, but involved significant behind the scenes direct advocacy;

d. The City officials who said directly it was the unions' demands that led to Plaintiff's firing were not lying;

114.119.     Upon information and belief, Darche and other City officials did not (and would not) call a quote in the N.Y. Post and a little listened-to podcast "heat" and "pressure."

115.120.     Darche and City officials' references to the Mayor's office mean that the union Defendants engaged in collaboration with the Mayor's office to get that office to try to force Plaintiff's firing.

116.121.     These efforts — the behind-the-scenes pressure, not a handful of quotes in a Post article and a podcast — were ultimately successful.

***The City fires Plaintiff because of either (or both of) his reporting or conviction.***

117.122.     On or about December 10, 2024, the City decided to fire Plaintiff because of his reporting on December 9, 2024 and by reason of his having been convicted of one or more criminal offenses.

118.123.     Defendant City made that decision after demands and discussions with the PBA and the SBA, which Plaintiff does not have access to.

119.124.     On December 10, 2024, CCRB Jennel Brooks called Plaintiff into her office.

14

120.125.    Brooks handed Plaintiff a letter terminating him, declaring it was because of a purported "failure to pass probation."

121.126.    Plaintiff asked if Defendant Darche was aware of the termination.

122.127.    Brooks stated, in sum and substance:  "Yes.  He's the one who fired you."

123.128.    Brooks also explained, in sum and substance:  "Ron, you're putting too much heat on the agency."

124.129.    Brooks was referring to, and Plaintiff understood her to be referring to, the pressure campaign by Defendants PBA and SBA.

125.130.    Upon information and belief, that "heat" reference was referring to specific communications from the unions, threatening things such as strikes or other action, if the City did not fire Plaintiff.

126.131.    The declaration Plaintiff failed to pass probation was pure pretext.

127.132.    Plaintiff passed every part of probation.

128.133.    Defendant City fired Plaintiff before the relevant test that would be a mechanism for failing probation would have been administered.

134.    Instead, Defendant City was retaliating for Plaintiff's acts reporting and recording members of the NYPD and terminating him at the unions' demands because of his having been convicted of one or more criminal offenses.

135.    In fact, the very day that Plaintiff was fired, Defendant Darche called Fred Vasselman, counsel for the PBA, and informed him that Plaintiff had been terminated.

129.136.    And on December 12, 2024, two days after Plaintiff was fired, Defendant Darche called Stuart London, also counsel for the PBA, to inform him of the same.

130.137.    The timing alone permits a strong inference of retaliation.

15

131.138.    Additionally, as set out above, Defendant Darche specifically stated the firing was in retaliation for the reporting and because of Plaintiff's background.

132.139.    Additionally, as set out above, Defendant unions specifically stated publicly they were demanding Plaintiff's firing because of his background — notwithstanding the statutory prohibition on firings for that reason.

133.140.    Plaintiff's performance at his job was excellent.

134.141.    An inference of retaliation is the only explanation for the CCRB's sudden about face.

135.142.    To be clear, Plaintiff alleges the motivation for his firing partially in the alternative.

136.143.    That is, there are two reasons for his firing — combined with the "heat" from the unions:  His CCRB report and his background.

137.144.    Either:  (1) the City fired Plaintiff for his background alone; or (2) it fired him because of the CCRB report.

138.145.    In the event of (1), that is pure discrimination — but Plaintiff would not have an additional First Amendment/Right to Record/etc. claim.

139.146.    In the event of (2), Plaintiff has shown an entitlement to discovery about what motivation was the driving factor, but he also has — to the extent that his CCRB report moved the needle — a First Amendment/Right to Record/etc. claim sounding in retaliation.

***The City closes the case unusually quickly.***

140.147.    Most CCRB investigations take substantial time.

141.148.    Some of that is because of the immense delay and backlog in the NYPD giving the CCRB body camera footage.

16

142.149.    Plaintiff's complaint was forwarded to an individual investigator on December 9, 2024.

143.150.    Just over a month later, the case was marked closed on January 14, 2025.

144.151.    The period between those dates contains the winter holidays.

145.152.    Upon information and belief, the CCRB did not conduct a reasonable investigation.

146.153.    Upon information and belief, the CCRB closed the complaint as part of its coordination with Defendants SBA and PBA and retaliation against Plaintiff.

147.154.    Plaintiff is aware of no other CCRB case closed that quickly.

148.155.    CCRB training requires an investigator to contacting the complaining victim, or "CV," ideally within 72 hours of the complaint, and schedule a full interview.

149.156.    No investigator ever called Plaintiff.

150.157.    Plaintiff, in fact, left a voicemail for the assigned investigator — whose identity he learned by following the case tracker online — but never received a return phone call.

151.158.    That failure violated the CCRB's policies.

152.159.    CCRB investigations also almost always rely on body camera footage.

153.160.    A request for body-worn camera ("BWC") footage should be made within 30 days (because of a 30-day deletion schedule).

154.161.    A request for Transit Authority video should be made within 14 days.

155.162.    According to CCRB training, a request should be made in every case where there is BWC or suspicion of BWC.

156.163.    Production of BWC from NYPD to CCRB takes substantial time.

157.164.    Upon information and belief, as of December 2024, the typical turn around

17

clocked in at multiple months, if not longer.

158.165.    In cases with six officers with BWC, it is implausible that BWC would be produced within only a few weeks.

159.166.    Upon information and belief, the CCRB did not receive BWC before closing the complaint.

160.167.    Closing the complaint in that manner, if BWC existed, would violate CCRB policy.

161.168.    On December 18, 2024, Plaintiff sent an email with the case number and assigned investigator in the subject line to Defendant Darche to make a record of the following:

1) The above-referenced complaint was filed by me with the CCRB on 09 December 2024;

2) Deviating from CCRB SOP, Mr. Skinnider didn't reach out to me by phone or email within 72 hours of his being assigned my complaint--nor as this email is written;

3) Mr. Skinnider didn't return my phone call despite my leaving him a voicemail;

4) Upon information and belief, Mr. Skinnider has failed to take immediate action necessary to secure the BWC footage from the six (6) officers who are the subject of my complaint, in violation of CCRB SOP;

5) Upon information and belief, Mr. Skinnider has failed to send a letter/subpoena to the NYC Transit Authority to preserve and obtain footage from fixed cameras located near the site of the complained of police misconduct, i.e., the West Broadway SW exit/entrance to the Chambers Street subway (1,2,3 line);

6) Upon information and belief, Mr Skinnider's stonewalling of my complaint is being done at your behest and with the intention of closing my complaint as "unsubstantiated."

162.169.    Upon information and belief (for ¶¶ 4, 5, and 6) or based on personal knowledge (for ¶¶ 1, 2, and 3), each of these allegations is true.

163.170.    That is:  The complaint was filed on December 9, the investigator did not return phone calls, the investigator violated CCRB SOP by failing to secure BWC, the investigator failed to request footage from the NYC Transit Authority, and the investigator was failing to follow

18

procedure specifically for the purpose of "stonewalling" the complaint at Defendant Darche's direction.

164.171.    The CCRB/assigned investigator then violated CCRB policy by failing to notify Plaintiff (the "CV") of the disposition.

165.172.    The CCRB/assigned investigator also violated CCRB policy by failing to notify Plaintiff of the procedure by which he could ask for a review of the disposition of the complaint by the Executive Director.

166.173.    When the complaint was closed the public closing notice did not contain any explanation (such as "Complainant Unavailable," "Unfounded," or "Unsubstantiated," or the like).

***Defendant Darche and City further retaliate by barring Plaintiff from First Amendment conduct, and impose prior restraints.***

167.174.    As part of the discharge alleged above, Defendant Darche also imposed certain restrictions on Plaintiff.

168.175.    Specifically, Darche barred Plaintiff from engaging in two kinds of speech.

169.176.    Darche imposed a wholesale bar — enforced by all members of the agency — on Plaintiff entering the CCRB.

170.177.    That bar prevents Plaintiff from filing CCRB complaints in person, as any person can do.

171.178.    There is no basis for that bar.

172.179.    Darche also barred Plaintiff from attending the CCRB's monthly meeting (of the kind described above).

173.180.    That bar prevents Plaintiff from speaking at the meeting in one of the four minutes slots reserved for members of the public.

19

174.181.	There is no basis for that bar.

175.182.	These bars are prior restraints.

176.183.	If Plaintiff attempts to speak at these meetings, he *will* be arrested and removed.

177.184.	A reasonable person would not risk arrest to speak in that context.

178.185.	Plaintiff reasonably believes he cannot speak at CCRB meetings or even enter the CCRB building to, say, file a complaint without being arrested.

179.186.	Plaintiff has, in fact, avoided speaking at CCRB meetings, self-censoring because of Defendants' restrictions.

180.187.	Upon information and belief, Darche imposed these bars at the request and in coordination and collaboration with the SBA and PBA and their respective members and heads.

### Additional Context for the SBA and PBA's Long History of Demanding and Obtaining City Action.

181.188.	Police unions in New York City—namely defendants the SBA and the PBA—are well known for their ability to successfully extract concessions from the City of New York, particularly related to areas of perceived threats to police autonomy, such as police discipline.

182.189.	The most consistent area of concern for these unions has been the CCRB.

183.190.	Originally established in 1953, the CCRB consisted of a three-officer panel. In 1966, in response to complaints of increasing police brutality against minorities, Mayor

20

John Lindsay sought to restructure the Board by appointing civilians.[4]

~~184.~~191.    In response, the PBA staged a massive police protest. At the steps of City Hall, then-president of the PBA John Cassese boldly stated that he was "sick and tired of giving in to minority groups, with their whims and their gripes and shouting." He asserted that "[a]ny review board with civilians on it is detrimental to the operations of the police department."[5]

~~185.~~192.    In advertisements, the unions told voters that killing the review board was so important that "your life may depend on it." [6]

~~186.~~193.    Ultimately, Defendants SBA and PBA successfully petitioned for a public ballot measure to return the Board to an all-police panel.[7]

~~187.~~194.    In 1992, when Mayor David Dinkins proposed amendments to strength the review board, the PBA organized another City Hall rally, attended by approximately 10,000 officers.[8] Officers were documented engaging in property destruction, blocking traffic, and assaulting journalists. Most egregiously, members carried signs that depicted Mayor Dinkins "with a bushy Afro haircut and swollen lips, with slogans that ridiculed him as a 'washroom attendant.'"[9]

~~188.~~195.    More recently, in 2022, Arva Rice, appointed interim chairwoman of the CCRB, was asked to resign by the Deputy Mayor for Public Safety,[10] after she criticized police for

---

[4]   William Finnegan, *How Police Unions Fight Reform,* THE NEW YORKER (July 27, 2020) https://www.newyorker.com/magazine/2020/08/03/how-police-unions-fight-reform; *see also* Thomas R. Brooks, *25,000 Police Against The Review Board. 'No!' Says the P.B.A.,* THE NEW YORK TIMES (Oct. 16, 1966)

[5] *Id.*
[6] David Firestone, *The NYC police union has a long history of bullying City Hall,* QUARTZ (Jul. 21, 2022) https://qz.com/317338/the-nyc-police-union-has-a-long-history-of-bullying-city-hall.
[7]   William Finnegan, *How Police Unions Fight Reform,* THE NEW YORKER (July 27, 2020) https://www.newyorker.com/magazine/2020/08/03/how-police-unions-fight-reform
[8] *supra* n 5.
[9] *Id.*
[10] Jeffrey C. Mays, *Chair of Police Oversight Board Resigns After Mayor Adams Pushes Her Out,* N.Y. TIMES (Jul. 22, 2024) https://www.nytimes.com/2024/07/22/nyregion/adams-ccrb-chairwoman.html; Fred Mouniget, *Adams Forces Out CCRB Head in Latest Blow to Police Accountability,* THE LEGAL AID SOCIETY (Jul. 22, 2024) https://legalaidnyc.org/news/adams-forces-out-ccrb-head-arva-rice/.

a delay in handing over critical evidence related to a fatal 2019 police shooting.

189.196.    In November 2024, Rice's successor, Dr. Mohammad Khalid, resigned after a sustained public campaign against him led by the PBA. In October 2025, the PBA wrote a letter to Mayor Adams demanding Dr. Khalid's removal, citing a "conflict of interest."[11]  Because of Dr. Khalid's voting record as a member of the Board, then-President of the PBA Patrick Hendry repeatedly called him "biased," "anti-cop" and accused him of disregarding CCRB rules and procedure in reviewing misconduct cases.[12]

190.197.    Following Khalid's resignation, Mayor Eric Adams named PBA-endorsed Pat Smith as the new interim CCRB Chairperson.[13]

191.198.    And despite police unions' prohibition on striking, they have employed other methods of coercion, in addition to protest and public fearmongering, such as "illegal work slowdowns—a tactic known as the 'blue flu.'"[14]

192.199.    In 1985, for example, following the manslaughter indictment of NYPD officer Stephen Sullivan for the shooting of a disabled elderly Black woman, the PBA initiated a work slowdown, which successfully pressured the City into restoring Office Sullivan to the force, even while under indictment. [15] In 1977, a Haitian immigrant sued the PBA after he was raped by three officers in a police station, accusing the union of helping the officers lie and otherwise

---

[11] I*d.*

[12] Rocco Parascandola, *CCRB chair resigns, blaming NYPD union 'campaign of lies' against him,* N.Y. DAILY NEWS (Nov. 11, 2025) https://www.nydailynews.com/2025/11/12/ccrb-chair-resigns-blaming-nypd-union-campaign-of-lies-against-him/.

[13] https://www.nydailynews.com/2025/12/09/adams-names-former-journalist-backed-by-police-union-to-head-nypd-watchdog/; instagram post.

[14]  William Finnegan, How Police Unions Fight Reform, THE NEW YORKER (July 27, 2020, https://www.newyorker.com/magazine/2020/08/03/how-police-unions-fight-reform.

[15]  Frank J. Prial, "Sullivan Acquitted in Bumpers Slaying," N.Y. TIMES (Feb, 27, 1987) (Accessed online) https://timesmachine.nytimes.com/timesmachine/1987/02/27/issue.html; s*ee also* David Firestone, "The NYC police union has a long history of bullying City Hall," QUARTZ (Jul. 21, 2022) https://qz.com/317338/the-nyc-police-union-has-a-long-history-of-bullying-city-hall.

hindering the investigation. [16]

193.200.      After the officers were convicted, then-president of the PBA Patrick Lynch stood on the courthouse steps declaring the officers' innocence, reaffirming his commitment to exonerating them, and denying any culpability. [17]

194.201.      Ultimately, after damning court testimony, the union agreed to settle for 1.625 million dollars—marking the first time a police union ever paid to settle a brutality case.[18]

195.202.      In 2019, after then-Commissioner James O'Neill announced that he was firing Daniel Pantaleo, the officer responsible for killing Eric Garner in 2014, the PBA initiated a vote of no-confidence against Mayor Bill de Blasio and called for his resignation.[19]

196.203.      In a formal statement Defendant Lynch accused O'Neill of appealing to "anti-cop" demands.[20]

197.204.      Just a few months later, O'Neill resigned as Police Commissioner.[21]

198.205.      Under Mayor de Blasio, the SBA and PBA mobilized their members in highly visible protests,[22] slowdowns[23] and used their political leverage to protest his embrace of police reform advocates and his perceived criticisms of police practices.[24]

---

[16] David Firestone, The Rise of New York's Police Unions, THE GUARDIAN (Jan 13, 2015), https://www.theguardian.com/us-news/2015/jan/13/new-york-police-unions-powerful.
[17] Id.
[18] Id.
[19] Tom Winter and Daniel Arkin, "NYC police union votes 'no confidence' in Mayor Bill de Blasio," NBC NEWS (Aug. 28, 2019) https://www.nbcnews.com/news/us-news/nyc-police-union-votes-no-confidence-mayor-bill-de-blasio-n1047541.
[20] Id.
[21] Brynn Gingras, Shimon Prokupecz and Eric Levenson, "NYPD commissioner resigning months after police union voted no confidence in him," KCRA (Nov. 4, 2019) https://www.kcra.com/article/nypd-commissioner-james-o-neill-is-resigning-after-3-year-tenure/29688769.
[22] Hundreds Turn Their Back on de Blasio at NYPD Officer's Funeral, ABC NEWS (Dec. 27, 2014) https://abcnews.go.com/US/nypd-officers-turn-back-de-blasio-cops-funeral/story?id=27851746.
[23] Reports from the NYPD Slowdown, NAT'L ASSOC.OF PUBLIC DEFENSE (Feb. 11, 2015) https://publicdefenders.us/blogs/reports-from-the-nypd-slowdown/.
[24] Michael M. Grynbaum, J. David Goodman & Al Baker, In Police Rift, Mayor de Blasio's Missteps Included Thinking It Would Pass, N.Y. TIMES (Jan. 11, 2015) https://www.nytimes.com/2015/01/12/nyregion/in-police-rift-mayor-de-blasios-missteps-included-thinking-it-would-pass.html.

199.206.    During the summer of 2020, after the nation erupted in protests over the murder of George Floyd, two officers were shot and killed in what the SBA called "anti-cop" violence. The SBA blamed and declared "war" on de Blasio via social media and accused him of selling out the NYPD to "vile creatures" who "hate cops."[25]

200.207.    The SBA later leaked arrest records via social media containing personal information about Chiara De Blasio, Mayor De Blasio's daughter, who was arrested while protesting. In addition to publicizing her arrest record, the SBA also falsely accused her of throwing objects at police officers.[26]

201.208.    This sustained pressure from the unions forced De Blasio to step back from some of his initial reform commitments—most obvious when he defended[27] police violence during George Floyd protests, during which police officers physically attacked protesters,[28] stating that they "acted appropriately."[29]

202.209.    Ultimately, in a drastic shift from his earlier years and campaign promises, Mayor de Blasio opposed legislation that would have regulated NYPD policing practices and reforms to the bail system.[30]

203.210.    Here, as Defendants SBA and the PBA have done time and time again, they

---

[25] Emma G. Fitzsimmons and Jeffery C. Mays, *After Officers Are Shot, Police Union Suggests an Enemy: The Mayor*, N.Y. TIMES (Feb. 11, 2020) https://www.nytimes.com/2020/02/11/nyregion/bronx-police-shooting-union.html.

[26] Dana Rubinstein and Jeffery C. Mays, *Police Union Discloses Arrest of de Blasio's Daughter in Privacy Breach,* N.Y. TIMES (Jun. 1, 2020) https://www.nytimes.com/2020/06/01/nyregion/chiara-de-blasio-arrest.html.

[27] Henry Austin, Suzanne Ciechalski and Tom Winter, New York Mayor Bill de Blasio defends police after video shows NYPD SUV driving into protesters, NBC NEWS (May 31, 2020) https://www.nbcnews.com/news/us-news/new-york-mayor-bill-de-blasio-defends-police-after-video-n1220246.

[28] Ben Adler, *Meet the men who scared de Blasio away from police reform,* CITY AND STATE N.Y. (Jun. 3, 2020) https://www.cityandstateny.com/politics/2020/06/meet-the-men-who-scared-de-blasio-away-from-police-reform/175932/.

[29] Erin Durkin and Sally Goldenberg, *Longtime supporters dismayed at de Blasio's shift from police reformer to defender*, POLITICO (May 31, 2020) https://www.politico.com/states/new-york/albany/story/2020/05/31/longtime-supporters-dismayed-at-de-blasios-shift-from-police-reformer-to-defender-1289640.

[30] *Id.*

pressured the City to unconstitutionally and unlawfully retaliate against Plaintiff by barring Plaintiff from First Amendment activity and imposing prior restraints on his First Amendment activity, and unlawfully terminating him.

**FIRST CAUSE OF ACTION**
**First Amendment/First Amendment Retaliation**
**(42 U.S.C. § 1983)**
**Against Defendants City and Darche**

211.    Plaintiff repeats the allegations contained in each of the foregoing paragraphs as though stated fully herein.

212.    Defendants retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment.

213.    Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

214.    Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

215.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

216.    Additionally, as discussed elsewhere herein, Defendant's choice to fire Plaintiff was an act of official policy making by a high ranking official, ratified by the City.

217.    Defendants' choice to bar Plaintiff from entering the CCRB, which is a bar on filing complaints in person as any citizen can do, and choice to bar Plaintiff from, attending public meetings and speaking for four minutes as any citizen can do, are each priors restraint on speech.

218.    Plaintiff will be arrested if he attempts to enter the CCRB.

25

212.219.    Plaintiff will be arrested if he attempts to attend or speak at a CCRB meeting.

213.220.    People are not required to endure arrest to challenge prior restraints.

214.221.    Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

215.222.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of his federal, state, and/or other legal rights; caused Plaintiff suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

216.223.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**SECOND CAUSE OF ACTION**
**Unlawful Discrimination and Aiding and Abetting Discrimination**
**(N.Y. Hum. R. L. § 296(15) and (6))**
**Against All Defendants**

217.224.    Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

218.225.    Defendants collectively worked together to ensure Plaintiff was fired "by reason of [his] having been convicted of one or more criminal offenses."  N.Y. Hum. R. L. § 296(15).

219.226.    It is an "lawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." N.Y. Hum. R. L. § 296(6).

26

220.227.    Defendant City directly violated N.Y. Hum. R. L. § 296(15), while the other Defendants aided and abetted that violation.  *See generally, e.g., Griffin v Sirva, Inc.*, 29 NY3d 174, 179 (2017) ("Section 296(6) extends liability to persons and entities beyond joint employers, and this provision should be construed broadly. Section 296 (6) applies to any 'person.' Unlike section 296 (15), nothing in the statutory language or legislative history limits the reach of this provision to employers").

221.228.    As set out above, Defendants' efforts were expressly premised on Plaintiff's conviction:  As Defendant Vallelong drew the connection, Plaintiff "was convicted of three homicides, *so he should be disqualified*."  N.Y. Post Article.

222.229.    To be clear, the aiding and abetting claim against the Union Defendants is *not* saying their comments in the N.Y. Post Article are the aiding and abetting.

223.230.    Rather, the aiding and abetting can be inferred from the facts above, including the following:

   a.  The Union Defendants objected to Plaintiff being employed at all at the CCRB: Plaintiff "was convicted of three homicides, *so he should be disqualified*."  N.Y. Post Article (emphasis added);

   b.  Darche and other City employees made repeated reference to "heat," "pressure," and the like from the unions (*see, e.g.,* ¶¶ 6362, 7371, 7776-7877, 8380-82, 128123**Error! Reference source not found.**-130125, above);

   c.  The unions' efforts, like coordinated union efforts in the past (*see* 188181-210203, above), were not limited to public comments, but involved significant behind the scenes direct advocacy;

   c.d. That direct advocacy consisted of at least five phone calls between counsel for the PBA and Defendant Darche during which PBA Defendants conveyed demands and threats that Plaintiff be fired because of his criminal conviction.

   d.e. The City officials who said directly it was the unions' demands that led to Plaintiff's firing were not lying;

224.231.    The unions were successful in this advocacy, and in collaborating with the

27

City to fire Plaintiff on the reasoning, directly, that he "was convicted of three homicides, *so he should be disqualified*." N.Y. Post Article (emphasis added).

**THIRD CAUSE OF ACTION**
**Ku Klux Clan Act**
**(42 U.S.C. §§ 1985 and 1986)**
**Against All Defendants**

225.232.    Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

226.233.    Defendants, as further set out above, joined together in a conspiracy to violate Plaintiff's civil rights, equal protection of the laws, and equal privileges and immunities under the law.

227.234.    Specifically — and as noted above, partially (but not completely) as an alternative theory — Defendants collaborated to retaliate against Plaintiff for filing the CCRB report, including by barring him from even speaking at future CCRB meetings.

228.235.    Defendants eventually collectively reached an understanding that Plaintiff would be fired in retaliation for his CCRB report and barred from certain First Amendment activities as a *quid pro quo* for the union Defendants ceasing attacking the CCRB about Plaintiff.

229.236.    Defendants all took material steps in furtherance of the conspiracy, including, as laid out above, making public statements, coordinating press statements and coverage, coordinating with the City and negotiating, and ultimately firing Plaintiff.

230.237.    As a result of Defendants' acts and omissions, those Defendants deprived Plaintiff of Plaintiff's legal rights, caused Plaintiff emotional injury, and/or otherwise damaged and injured Plaintiff.

231.238.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

28

**FOURTH CAUSE OF ACTION**
**Violation of City and State Right to Record Acts**
**(N.Y. Civ. R. L.§ 79-P and N.Y.C. Admin. C. § 14-189)**
**Against All Defendants**

232.239.    Plaintiff repeats the allegations contained in each of the foregoing paragraphs as though stated fully herein.

233.240.    Defendants' acts violate the rights codified in New York Civil Rights Law § 79-P and N.Y.C. Admin. C. § 14-189 et seq. (together, the "City and State Right to Record Acts").

234.241.    By way of clarification, this claim sounds purely as a retaliation-type claim: It is not that Defendants successfully "prevent[ed]" recording (§ 79-P(3)(a)(i)), but that Defendants "threaten[ed] [Plaintiff] for recording a law enforcement activity."  § 79-P(3)(a)(*ii*).

235.242.    When he reported the officers on December 9, 2025, Plaintiff was exercising his rights under the City and State Right to Record Acts in that he was attempting to record (see below) law enforcement activity.

236.243.    Those acts protect all recording, whatever its form, including capture of conduct "by way of written notes or observations."  N.Y. Civ. R. L. § 79-P(1)(c).

237.244.    Plaintiff made written notes and ultimately filed a report made up of written notes that were an "attempt to capture" (*id.*) the conduct he observed.

238.245.    Plaintiff then submitted that "recording" (in the statutory sense) to the CCRB.

239.246.    As set out above, the union Defendants threatened Plaintiff for that, by demanding retaliation from the CCRB.

240.247.    The City made good on those threats, firing Plaintiff (within the alternative theory caveat discussed above) for his recording.

29

248. To be clear, there is no basis to claim the recording is different than a use thereof. The law would not provide a defendant a defense if, for example, an officer who was recorded threated and arrested someone not *directly* because of a recording, but because the recording went viral: If the statute permitted that defense, the exception would largely swallow the whole statute.

249. And the drafters of the statute were very concerned — in the wake of the murder of George Floyd — with specifically retaliation against people because of viral videos.

250. Accordingly, Defendants — collectively and individually — violated the City and State Right to Record Acts by, among other things "threatening [Plaintiff] for recording[31] a law enforcement activity," and ultimately causing Plaintiff to be fired for his recording activity.

251. The City and State Right to Record Acts each create a private right of action that explicitly provides for punitive damages and injunctive relief, as well as mandatory attorneys' fees and expert fees.

252. Defendants' actions violate the City and State Right to Record Acts such that all the remedies available thereunder are appropriate.

**FIFTH CAUSE OF ACTION**
**Tortious Interference with Contract**
**Against Defendants PBA, SBA, Vallelong, and Hendry**

253. Plaintiff hereby realleges and incorporates by reference all of the preceding paragraphs as though they were fully set forth herein.

254. Plaintiff had a contract for employment with the City and the CCRB.

255. Defendants PBA, SBA, VAllelong, and Hendry, as detailed above,

---

[31] Here, "recording" is used in the statutory sense, which includes written notes.

30

intentionally sought to cause the City to fire Plaintiff.

256.    As set out above, Plaintiff's cause of action is *not* based upon public statements to newspapers made by the union Defendants; those statements are context that explicitly provides their intention.  The cause of action is based upon the "pressure," "heat," and so on that City officials explicitly stated the union Defendants were putting on the City behind the scenes, and *not* in public.

249.257.    That "heat" was conveyed, at least in part, through multiple phone calls between PBA Defendants and City Defendants, ultimately culminating in City Defendants' decision to terminate Plaintiff, in response to PBA Defendants' demands.

250.258.    Defendants' efforts to that end were unlawful and tortious.

251.259.    Defendants intended to interfere with Plaintiff's employment.

252.260.    Defendants' knew that their role as a police union and the leverage they bring to bear as such would affect Plaintiff's employment with the City.

253.261.    As a direct and proximate result of Defendants' conduct, Plaintiff lost his job.

254.262.    Defendants' unlawful conduct was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### DEMAND FOR A JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

### PRAYER FOR RELIEF

WHEREFORE, the plaintiff demands judgment against the individual defendants and the City of New York as follows:

i.      actual and punitive damages against all defendants but the City in an amount to be determined at trial;

ii.      actual damages in an amount to be determined at trial against the City of New York;

iii.      reinstatement with backpay;

iv.      punitive damages in an amount to be determined at trial against the City of New York pursuant to the City and State Right to Record Acts;

v.      an injunction and declaratory relief pursuant to the City and State Right to Record Acts, forbidding any future retaliation against people who report police misconduct;

vi.      attorney's fees pursuant to, inter alia, 42 U.S.C. §1988, the City and State Right to Record Acts, and New York common law;

vii.      disbursements, and costs of the action;

viii.      expert costs and fees pursuant to the City and State Right to Record Acts; and

ix.      such other relief as the Court deems just and proper.

Dated: Queens, New York
       March 27, 2026

/s/  Remy Green

By:      _____
          J. Remy Green

**COHEN&GREEN P.L.L.C.**
1639 Centre Street, Suite 216
Ridgewood, NY 11385
Tel.: 929-888-9480
remy@femmelaw.com

32